NORTHWESTERN COOPERAGE & LUMBER CO. v. RUBINSKY.

1. CONTRACTS—SALES—WORDS AND PHRASES—SCRAP IRON.
Under a written contract to sell all the scrap iron owned by plaintiff at a place specified, defendant was not entitled to claim materials, dynamos and engines which were capable of being repaired and placed in running order.

2. SAME—CONSTRUCTION—PERFORMANCE.
Failure of defendant to furnish shipping directions at the request of the vendors of certain scrap iron, the required information not appearing in the written contract between the parties, excused the vendor for not shipping the merchandise.

3. SALES—INTERPRETATION OF CONTRACT.
Under the provisions of a contract of sale of certain scrap, specifying the kinds and prices, railroad weight at the point of shipment to constitute the basis of settlement, evidence that the railroad company weighed the respective kinds of material separately and the weights so found, was conclusive on the buyer.

4. EVIDENCE—CONTRACTS—PAROL TESTIMONY.
    Parol testimony is not competent to vary the plain, un-
    ambiguous terms of a writing.

Error to Muskegon; Sullivan, J.   Submitted Janu-
ary 20, 1914.   (Docket No. 132.)   Decided June 1,
1914.

Assumpsit by the Northwestern Cooperage and
Lumber Company against Henry Rubinsky for breach
of contract.   Judgment for plaintiff.   Defendant
brings error.   Affirmed.

*Cross, Vanderwerp, Foote & Ross,* for appellant.

*William Carpenter (G. R. Empson,* of counsel), for
appellee.

BROOKE, J.   Plaintiff and defendant entered into
the following contract:

                    "GLADSTONE, MICHIGAN, Feby. 9—09.
"H. RUBINSKY,
        "Muskegon, Michigan.
*"Dear Sir:*
    "This will confirm our conversation of even date
whereby we agree to sell you and you agree to pur-
chase and pay for what scrap iron we may have at
Gladstone at the following prices f. o. b. cars, rail-
road weight at Gladstone to be final basis of settle-
ment:   Scrap, $8.50; sheet iron and saws, $3.00 per
net ton.
    "We also agree to pay you $300.00 for burner now
located at Garth, with the privilege of moving same
at any time during the coming summer.   Your ac-
ceptance will constitute all the contract necessary be-
tween us, and shall be binding upon our respective
successors, heirs, and assigns.   All brass, copper, and
dynamo is included.
                        "Yours truly,
                    "N. W. COOP. & LBR. CO.,
                                "F. P. BUSHONG.
    "Accepted:   H. RUBINSKY,
                    "Per—Harry."

Certain scrap was delivered to defendant thereunder, but he declined to pay therefor. Plaintiff thereupon brought suit to recover the value of the same, filing its declaration in assumpsit, and serving a bill of particulars of its claim as follows:

1909.

| | | | |
|---|---|---|---|
| Feb. 22 | 5,800 lbs. sheet scrap iron at $2.75 per net ton...................... | $ | 7 98 |
| | 41,200 lbs. cast scrap iron at $8.50 per net ton...................... | | 175 10 |
| 27 | 7,300 lbs. sheet scrap iron at $2.75 per net ton...................... | | 10 04 |
| | 43,000 lbs. cast scrap iron at $8.50 per net ton...................... | | 182 75 |
| | 4,900 lbs. sheet scrap iron at $2.75 per net ton...................... | | 6 74 |
| | 105,525 lbs. cast scrap iron at $8.50 per net ton...................... | | 448 48 |
| | | | $831 09 |

Loaded in Car No. 40776-30545-32852.

To this declaration the defendant filed a plea and notice. Generally speaking, the notice sets out that plaintiff had made breach of the contract, in that it had not delivered to defendant all of the scrap bargained for, and that therefore the defendant had lost the difference between the contract price and its value —about $6 per ton, a total of $900—that no brass, copper, or dynamos were delivered, and that he should have received 3,200 pounds of this material, and which was worth $251.51 per net ton in excess of the agreed price of $8.50 per net ton, entailing a further loss on defendant of $403. Further, that plaintiff failed to deliver to defendant 15 tons of sheet iron and saws, which were worth $8.50 per net ton, an excess of $5.50 per net ton over the agreed price of $3, entailing a further loss on defendant of $82.50. Defendant asked that his damages occasioned by the alleged breach of the contract by plaintiff should be ascer-

tained, and such portion as was necessary set off against plaintiff's claim, and the balance thereof certified in his favor.

At the close of the testimony, the court directed a verdict for the plaintiff in the sum of $759.70.

Defendant's assignments of error are grouped under two heads: (1) Error in directing a verdict for plaintiff; (2) error in the admission and rejection of evidence.

It appears that the scrap actually shipped was shipped on February 22 and February 27, 1909; that thereafter plaintiff made frequent demands upon defendant for payment. On April 3, 1909, plaintiff wrote defendant the following letter:

"GLADSTONE, MICH., 4/3/09.

"MR. H. RUBINSKY,
        "Muskegon, Mich.

*"Dear Sir:*

"We have yours of the 31st ult., and, replying, you are laboring under a mistake or misunderstanding, as we shipped you practically all the scrap we had, except a little that we were not able to gather up out of the snow, but it is not enough for a car load.

"As to the brass, copper, and dynamos. The dynamos we sent to shops and will repair. There was no brass, except a couple of small quarter boxes, and, inasmuch as we are repairing two or three of the engines that went through the fire, these small boxes are being used. We shipped no scrap to other parties, except such as we are getting repaired to use again in our mill, and you must know that we are entitled to do this. You are taking a very technical position indeed in suggesting the things you do in your letter. We have given you an absolutely fair deal in every respect, and do not take kindly to such a letter as you have written. We treated this matter properly when you were here, giving you preference when we could have shipped the iron to better advantage to other people, because we had done business with you in some of the material at Garth. Furthermore, every dollar's worth of material we ever bought of you at Garth we paid you spot cash right in our office. Now you

come along with a letter such as you have no right to write. We are entitled to settlement long ere now for the iron shipped you, and will ask you to kindly send us remittance promptly.

"We also note you mention a difference in your weight and the railroad weight. We do not know why there should be any difference, as you know we are not interested in same as the basis of the sale to you was railroad weights to govern. We have evidence to believe the railroad weight is correct and furthermore we are shipped hundreds of cars per month of all kinds of material that are weighed over the railroad scales at Gladstone and we find their weights in every case to be very accurate.

"We called your attention to the matter of the 2 per cent. that was on our invoice in some way by oversight. Such terms as you know, are not known to the trade at all, and we surely are as much entitled to our money when this iron was shipped, as you are to expect spot cash for material we buy of you. The raising of the question in your letter and intimations made will not tend to make future business with you very desirable, unless you are disposed to treat this matter in exactly the spirit in which the deal was made.

"We shall expect to hear from you promptly, so that we will know exactly where we are at in this matter."

On May 17, 1909, defendant wrote plaintiff the following letter:

"May 17, 1909.
"NORTHWESTERN COOPERAGE & LUMBER CO.,
          "Gladstone, Mich.
"*Gentlemen:*

"Replying to your favor of the 15th inst., I have to say that my contract provides that I shall receive all scrap which you had on your premises at the time that contract was made, and should also have all brass and dynamos; and I am surprised that you should have shipped any of the material covered by my contract, when you knew that I was entitled to it.

"I want a full statement showing what became of this material, through which I am entitled to, under my contract.

"When I get this information, I will be ready to adjust this matter; but you certainly could not ask me to settle until you comply with the terms of this contract fully."

After some further correspondence, plaintiff wrote defendant as follows:

"Gladstone, Mich., 5/15/09.
"Mr. H. Rubinsky,
    "Muskegon, Mich.
"*Dear Sir:*
"We are in receipt of yours of the 10th. In reply, we sent to Escanaba three of our engines, constituting in all two car loads, for repairs, just as was our right according to the deal with you. It developed afterwards that one of the engines was so badly burned that it could not be repaired, consequently it was scrapped. There was also, we believe, enough put in to make car load weight, but just what this was, we are at this time unable to state. Be this as it may, you know very well that our deal provided that we were to reserve such materials as we needed for our use or any of the material or this scrap that we could use and why you should be hanging back as you are is more than we can understand. It certainly has nothing to do with the adjustment of the matter. We will thank you, therefore, to clean it up promptly.
                "Yours truly,
    "The Northwestern Cooperage & Lumber Co.,
        "By I. N. Bushong, Manager."

Fourteen days later plaintiff wrote the following letter:

"Gladstone, Mich., 5/29/09.
"Mr. H. Rubinsky,
    "Muskegon, Mich.
"*Dear Sir:*
"Replying to yours of the 17th. As stated in our former letter, our agreement provides that we shall reserve any of the material that went through the fire that we can use in our rebuilding and what you are trying to get at in writing the way you do is more than we can understand. This was all set out very plainly in the contract, and, as you know, was also

talked fully between yourself, my son, Mr. Staple, and myself when you were here. We sent car No. 93501, weighing 45,600 pounds, and car No. 28799, weighing 45,400 pounds, to the Chatfield Iron Works at Escanaba, and on these cars were five of our engines that were through the fire, and besides some other fittings. This is everything that has gone from here, except what has been loaded on your cars. All of this material we had a perfect right to reserve as contract provides. We need not have given you more than one car load if we did not wish to, but we have given you an absolutely square deal just according to the contract, and we ask you to come forward and settle now, or we shall have to take other measures. If you do not think we have been square with you, why don't you come over and investigate, and not be playing the coward as you are. We have in the neighborhood of two cars of scrap here yet, but you can rest assured that it will not be shipped until you change your attitude very much. What we want now is a settlement, or else we shall take legal proceedings very shortly. Your letters are entirely out of order. We have at all times kept within our rights. We are ready to demonstrate this to you any time you will come over and make the investigation.

"Yours truly,

"THE NORTHWESTERN COOPERAGE & LUMBER CO.,
"By I. N. BUSHONG, Manager.

"Two of the engines referred to have been repaired and are here. Three are still at the iron works in Escanaba, and you can very easily verify all we have said. We paid you cash for all the Garth material, hence your attitude is all the more ridiculous."

On June 30, 1909, plaintiff wrote the following letter:

"GLADSTONE, MICH., 6/30/09.

"MR. H. RUBINSKY,
"Muskegon, Mich.
"*Dear Sir:*

"We have had no advice from you with shipping orders for the balance of the scrap here and have now been waiting for nearly 30 days. If we do not hear from you within the next four or five days, as per

our former letter, we shall sell this material in other directions, as we must have it off the ground.

"Yours truly,
"THE NORTHWESTERN COOPERAGE & LUMBER CO.,
"By B."

It appears to be defendant's claim that he was entitled to receive everything of metallic character belonging to plaintiff that went through the fire. Expert evidence was offered on the part of plaintiff as to what the term "scrap iron" included. We are satisfied that it cannot be held to include any material which is in a condition which will permit of repair. The correspondence clearly shows that the engines and dynamo were shipped by plaintiff for the purpose of repair, and that they were all repaired, with the exception of two of the engines, which turned out upon examination to be too badly burned to permit a restoration. The letter of plaintiff to defendant of June 30th, *supra,* indicates a willingness on the part of the plaintiff to deliver to defendant all the remaining scrap, even though the defendant had up to that time declined to make settlement for that which had been shipped to him in the month of February. Defendant did not comply with the request for shipping instructions, and therefore cannot be heard to complain that he did not, in fact, receive all of the scrap. It is therefore unnecessary to determine whether plaintiff was entitled to demand payment for the scrap already shipped and to decline to ship the balance in case payment was not made.

Under the terms of the contract, the railroad weight at Gladstone was to control. Defendant does not contend that he has not received according to the railroad weight the iron which at the contract price would represent the amount of the judgment against him. He does, however, claim that the proportion of cast scrap and sheet scrap was not such as is indicated by the plaintiff's bill of particulars. This claim is based upon

the evidence of defendant's son, who claimed to have examined the scrap after receipt, and that it was three-quarters sheet iron and one-quarter heavier iron scrap. The record discloses that in loading the cars the cars were first weighed empty by the railroad company, and were then loaded with light scrap and again weighed, and thereafter the load was completed with heavier scrap, the various weights being taken by the weighmaster. Evidence of these weights was introduced at the trial, and we are of opinion that, under the terms of the contract, the defendant is bound by them, and cannot, after receipt of the material, question their accuracy.

Error is assigned upon the refusal of the court to permit the defendant to testify how certain words in the contract came to be inserted. The court was clearly right in the ruling, as the contract was plain and unambiguous, and must be construed by the court according to its terms.

Other errors are assigned as to rulings of the court in rejecting certain testimony. They require no discussion.

The judgment is affirmed.

MCALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.