No. 15,020.

SHEFTEL *v.* THE PEOPLE.
(141 P. [2d] 1018)

Decided September 20, 1943.

Messrs. VAN CISE, ROBINSON & CHARLTON, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General,. Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. CHIEF JUSTICE YOUNG delivered the opinion of the court.

DEFENDANT was found guilty under a grand jury indictment charging him with feloniously buying and receiving 5000 pounds of stolen aluminum, knowing the same to have been stolen. On the verdict of the jury the court entered judgment sentencing him to a term in the state penitentiary. He seeks a reversal on numerous assignments of error, directed principally to the court's allegedly prejudicial remarks in the presence of the jury and to rulings permitting admission, over objection, of testimony offered by the people, and exclusion of testimony offered by defendant, to which rulings exceptions were duly saved.

The Shattuck Chemical Company, doing business in the city of Denver, had purchased a carload of practically pure aluminum, shipped to them in one hundred and two hundred. pound gunny sacks, the metal being in the form of small pellets that had the appearance of having dropped while in a fluid state on a hard surface and then solidified. These pellets were of the size generally of large buckshot. This metal the Shattuck Company used in part in some of its chemical operations, the remainder being stored in the company warehouse. Bayard Tillotson and Wendell Woodhams were employed by the chemical company and had knowledge of the stored aluminum. After they ceased to be so employed, they went back at various times and without

authority removed large quantities of the stored metal and carried it away, selling it to a half dozen or more various dealers in metals in the city of Denver, including the Peerless Alloy Company where defendant Sheftel was employed. Sheftel was purchasing agent and assistant superintendent of the company but had no interest therein except he was given one share of stock to qualify him as a director which he reendorsed to the company. He received no bonuses from his employer. The Peerless company does a large business in metals and buys and ships them to eastern markets. Sheftel, over a period of time from June 19, 1940 to December 24, 1940, and on seven or eight different occasions, purchased this sacked aluminum from Tillotson and Woodhams in varying quantities from 285 pounds to 5,000 pounds. The price paid was eight cents per pound. The total quantity purchased by defendant was approximately 17,700 pounds. Tillotson and Woodhams gave their names as David Fine and Homer Burts and the transactions with defendant were all carried on by them under these aliases. They used other names in transactions with other metal dealers.

A large number of the assignments of error are directed to offers of proof made by defendant and refused by the court. There are twenty-four principal assignments with many subheads, covering twenty-two pages of the abstract. To analyze each of them separately would require an extension of this opinion beyond all reasonable limits. We have carefully examined and considered the record, the legal questions raised and argument of counsel and are of the opinion, based thereon, that defendant was not accorded a fair trial.

The people's theory of the case is that defendant, as the purchasing agent for his concern, bought from two unknown parties at various times over a long period of months, large quantities of new, sacked, granulated ingot aluminum, recognized as a particular form of such metal and regularly priced and quoted on the New York mar-

ket and in standard trade journals in that form and that the circumstances, disclosed by the evidence, under which it was purchased were such as to import to defendant knowledge that he was purchasing stolen property. Defendant's theory is that the aluminum was purchased by him as scrap in the usual course of business, which was in large part the acquirement of metals as scrap, including aluminum, and that he had no knowledge of new aluminum being sold in such form as that in question, and did not know that the metal in question had been stolen. Out of these two conflicting theories the issues arise.

■ While we can understand from a reading of the record how the trial court was led to make many of the remarks, now assigned as error, by reason of the involved manner in which the relatively simple defense was presented, such remarks, if prejudicial, and we think some of them were, should not be allowed to prejudice the defendant in his right to receive a fair and impartial trial. The first assignment is directed to the court's statement in the presence of the jury, "There is no scrap metal involved here," and, "The metal involved here is not scrap metal." The court doubtless was speaking of the matter from the standpoint of the people's theory of the case and from that standpoint his statement was correct. It was brought out by the insistence of counsel for the defense on improper cross-examination of a witness who was called by the people to prove the value of new granulated ingot aluminum and who had not even attempted to qualify as having knowledge of the price of aluminum scrap; notwithstanding, the court, instead of distinguishing between the conflicting contentions, that of the people that it was new metal, and of defendant that it was scrap, made the unequivocal statement—not as the contention of the people but as a fact—that it was not scrap. We cannot say, being mindful of the weight given to statements of the court by jurors, that this did not prejudice the defendant before the

jury. Furthermore, we are of the opinion that it was error for the court to refuse defendant the right to show the size of the plant of which he was assistant superintendent, and the extent of its business. The language used by the court in his ruling that the question, "What is the size of the plant down there?" was objectionable, was unfortunate and calculated to prejudice the rights of defendant. He said: "Anything that is pertinent to this transaction is relevant here, but these other matters in the form of a build-up are not material and the jury should not be burdened with it." Not only do these words deny the relevancy of clearly relevant evidence, but thereby the court insinuated that it was offered by counsel merely to build up his case with knowledge that it was not material. The insinuation is emphasized by the remark directed to counsel for defendant shortly thereafter: "Don't you think it would be a good idea to get down and try the issues in this case?" When counsel replied, "We are doing our best to present the defendant's case to the jury," the remark was stricken from the record by the court. The jury could scarcely fail to draw the conclusion from this occurrence that the court was of the view that the size of the plant and the extent of the business were wholly irrelevant and that the court was charging counsel for defendant with attempting, knowingly, to place irrelevant matters before it. We digress here to remark that we think the evidentiary character of a transaction involving the purchase of five thousand pounds of aluminum, the quantity named in the indictment, by a concern doing a three hundred-thousand dollar business, which defendant offered, but was not permitted, to prove was the extent of the annual business of the Peerless Alloy Company, as showing a knowledge that the goods were stolen, is quite different as a circumstance importing knowledge, from what it would be had a junk collector, using only a horse and wagon in his business, bought the same quantity of aluminum from two persons whom he did not

know. What might be a purchase in the ordinary course of business by one, would clearly be a purchase out of the ordinary course of business by the other.

Shortly after the occurrence above narrated defendant's counsel asked him, "When you made purchases other than from large companies like the Western Electric Company, the Public Service Company, or the Tramway Company, did the Peerless Alloy Company keep a record of those purchases?" In sustaining an objection thereto, the court said: "That question, without dressing, would be, did they keep a record of the purchase of those metals. That is all there is to that." And when counsel asked that an exception to the statement be noted, the court said, "That is all right. That is just what it is." The record discloses that a large part of the Peerless Alloy Company's business was purchasing scrap metals in large quantities from these three mentioned companies with which it had contracts. The question was entirely proper, and the insinuation of the court that it was "dressed up" and presumably intended to present evidence which was irrelevant or immaterial, tended to minimize any effect that an answer to the question might have on the jury, and to lead it to draw the conclusion that the court thought there was something sham about defendant's defense.

In view of the possibility of a retrial of this cause, we deem it advisable to comment on the assignments of· error directed to the refusal of the court to permit the cross-examination of Tillotson and Woodhams as to their sales to other metal dealers, and as to what they told the various dealers. In view of the fact that one of these witnesses admitted that he told different stories as to his identity and as to the source from which the aluminum was procured, we are not impressed with the idea that it was necessary to permit a cross-examination in detail as to what was told each of the other purchasers in order to "break down" the witness and possibly get him to admit that he did not remember

what story he told to Sheftel. It clearly appears from the record that Sheftel was not on a quest for definite information as to where this aluminum was procured. Interrogation eliciting the information that sales were made to a large number of dealers and as to whom such sales were made, we think, would have been proper on cross-examination as a foundation for calling such witnesses to show that they purchased the aluminum as scrap. What Tillotson and Woodhams may have said to other dealers, in the absence of a showing that Sheftel knew what they told them, or even that they were selling them similar aluminum, is wholly immaterial.

We have commented on the matter of how the identification of these various purchasers might be material as a preliminary matter, because there is a specific assignment of error directed to the denial of the right to elicit such information on cross-examination without it clearly appearing that it was for the purpose of identification only.

■ Defendant also assigns as error the refusal of the court to permit him to show by witnesses, other than himself, that the aluminum involved was treated and regarded as scrap by those who purchased it. We are of the opinion that such fact, if it was a fact, was competent and material evidence. The district attorney and the court seem to have held the view that because the aluminum involved was a recognized form of the metal, priced and quoted and sold regularly on the market in such form, that it could not be scrap metal. There was no difficulty concerning the proposition that salvaged aluminum cable of approximately the same degree of purity as the aluminum here in question was scrap metal. The view of the district attorney, judging from his objections, and of the court, as appears from its rulings, was that the fact that the sacked aluminum here involved had never been used—in other words, was new and in the form into which it was processed and sold—took it out of the class of "scrap metal." The scrap

character does not depend upon any inherent characteristic or form of the metal. If it has a peculiar value to those dealing at the time and place where it is sold and purchased by virtue of its being theretofore unused, its form or other inherent characteristic, then it is not scrap metal. If, regardless of whether it is new and unused, it has no peculiar value to those dealing in it by reason of its form or other inherent characteristic, except as material for remanufacture, then it might properly be considered in such dealing as scrap metal. The proper distinction, as we see it, is indicated in the following definition from Words and Phrases (permanent edition), volume 38, page 364: " 'Scrap iron,' is all waste or refuse iron which has been in actual use and is only fit for remanufacture, without reference to whether it is new or old. Schlesinger v. Beard, 7 S. Ct. 546, 547, 120 U.S. 264, 30 L. Ed. 656."

If in Denver, the aluminum here involved at the time the sales were made, had no value by reason of its form or unused condition, greater than used aluminum utensils or cable of similar degree of purity, and if it was considered to be scrap by a large number of dealers in metals who purchased it, and as having no peculiar value other than the same metal in used utensils or cable of comparable purity, then the fact, if it was a fact, that it was purchased by defendant at a price per pound in line with the price paid for other aluminum of comparable purity would tend to negative any bad faith in its purchase. One who purchases any commodity at a price far below its reasonable market value might subject himself to the inference of having knowledge that the vendor's title was that of a thief, when no such inference would arise if he paid the usual and regular market price for the commodity at the time and place the purchase was made. In the instant case the reasonable market value depends on whether dealers generally would consider it as scrap in Denver or as having a peculiar value by reason of its form and the fact of its

not having been used. Whether defendant purchased the aluminum at a reasonable market price in Denver, or so far under the market price that it is a circumstance tending to impart knowledge to him of its stolen character, was vital to his theory of defense. We know of no other or better way of showing that in Denver at that time the aluminum in question had no peculiar value by reason of its form and unused character, than by ascertaining how those who dealt in the metal considered it. While the offer of the evidence is not as clear and explicit as could be desired, we understand that to have been its purport and it was error to exclude it.

Error is assigned to the admission of the testimony of witness Lyerman as to a conversation had by him with Max Rifkin out of the presence of defendant, while defendant was ill and absent from his place of business, wherein Rifkin, then working in defendant's place, is reported to have stated that the Peerless Alloy Company did not buy from individuals; that most of the company's transactions were with other junk yards; and that it had a large business with the Western Electric and Telephone companies. It needs no citation of authority to show that such testimony is inadmissible. Since defendant's contention was that he bought this metal in the ordinary course of business, the prejudicial character of the reported statement of Rifkin that the company did not buy from individuals, is apparent.

Without attempting to set forth or analyze all of the errors assigned, we think the foregoing sufficiently discloses the misapprehension of the court concerning the real issue involved, indicates with sufficient clarity wherein the proceedings fell short of according to defendant a fair trial, and will prevent a repetition of the errors indicated in the event of a retrial.

Judgment reversed.

Mr. Justice Bakke, Mr. Justice Burke and Mr. Justice Jackson dissent.