Carroll
No. 84-268

THE STATE OF NEW HAMPSHIRE

v.

ROBERT A. BRYANT

August 7, 1985

*Stephen E. Merrill,* attorney general (*Peter C. Scott,* assistant attorney general, on the brief and orally), for the State.

*Law Offices of O. Lee Gregory,* of Conway (*Fay E. Melendy* on the brief and orally), for the defendant.

SOUTER, J.    The defendant appeals an order of the superior court enjoining him from storing damaged automobiles on a strip of his land in Conway between Route 302 and a fence that blocks the view from the highway to an enclosed area. We affirm.

By Laws 1967, chapter 252 the legislature enacted RSA chapter 249-B (now RSA 236:90 to :110) in response to the national Highway Beautification Act of 1965. *See* PUB. L. 89–285 (codified as 23 U.S.C.A. §§ 131, 135 note, 136, 319 (West 1966)). The stated policy of the New Hampshire statute was to control junkyards adjacent to segments of federal aid primary and other highways, *see* 23 U.S.C.A. 103 (West 1966), for the sake of promoting safety and recreation and preserving natural beauty. RSA 249-B:1 (now RSA 236:90). The statute defined a "junkyard" to include a place for storing "junked, dismantled or wrecked automobiles," RSA 249-B:2, II, III and IV (now RSA 236:91, II, III and IV), and its practical effect was to require that a junkyard located within 1,000 feet of one of the specified highways be screened from view. *See* RSA 249-B:2, I (now RSA 236:91, I); RSA 249-B:4, :6, :7, :11 (now RSA 236:93, :95, :96, :100).

For many years prior to the enactment of the statute in 1967, the defendant's father, Robert H. Bryant, carried on an automobile wrecking and salvage business along Route 302, a segment of the federal aid primary highway system. In 1979 the father, his wife and the present defendant signed an annual licensing agreement with the State, authorizing the operation of the business as a junkyard and providing for the storage of all junk within an area to be screened. At some point thereafter the present defendant assumed the operation of the business. By 1982, he was using a strip of land

located within 1,000 feet of the highway, and lying between it and the screening fence, as a place to store automobiles damaged in accidents and held by him as bailee while their owners and insurers decided whether to repair or scrap them. The State charged that this was a violation of the statutory requirement to screen a junkyard and brought a petition to enjoin the practice.

The matter was heard before a Master (*William H. M. Beckett,* Esq.), whose report recommending an injunction was approved by the Superior Court (*Wyman,* J.). The master found that the damaged cars owned by third parties were "wrecked automobiles" within the meaning of RSA 249-B:2, II (now RSA 236:91, II) and were therefore junk required to be kept within the screened area. The court's order in accordance with the master's recommendation enjoined the storage of such cars between the fence and the highway.

In this appeal the defendant argues that "wrecked automobiles" must be defined so as to exclude any vehicle that is not irreparable or that is owned by anyone other than the defendant. He claims that the master erred in defining "wrecked automobiles" broadly enough to include non-owned vehicles and vehicles that could be repaired, and erred further in admitting evidence of activity at the junkyard prior to the time at which the statutory violations were alleged to have occurred.

Taking up, first, the definition of "wrecked automobiles," we start with a statute that does not expressly define the term. From the context of its usage in RSA 236:91, II with "junked" and "dismantled," we can infer that a wrecked automobile may be something different from one that has been through a process of junking or dismantling, but beyond that we must look to common usage, RSA 21:2, and the evident purpose of the statute, *White v. Lee,* 124 N.H. 69, 74, 470 A.2d 849, 852 (1983).

In common usage "wrecked automobile" certainly would include one that cannot, or cannot economically, be repaired, but the term is not understood to be confined to that narrow category. Several cases of somewhat mature age, construing the terms of insurance policies, followed a standard dictionary definition in holding that "to wreck" is to destroy, disable or seriously damage. *Aurnhammer v. Brotherhood Acc. Co.,* 250 Mass. 563, 568, 146 N.E. 47, 48 (1925); *Zohner v. Sierra Nevada Life & Casualty Co.,* 114 Cal. App. 85, 89, 299 P. 749, 751 (1931). "[I]n ordinary speech an automobile is said to be wrecked when it is disabled or seriously damaged, although it may not be totally destroyed or rendered incapable of use." *National Casualty Co. v. Mitchell,* 162 Miss. 197, 203, 138 So. 808, 809 (1932). The same definition, to destroy, disable or seriously damage, is carried for-

ward into Webster's Third New International Dictionary, under "wreck," with a specific, though not technical, illustration of a wrecked ship. *Id.* at 2639 (1961). Our own experience accords with these authorities, that "seriously damaged" is an accepted meaning of "wrecked."

■ The definition should, however, be tested by reference to the evident purpose of the statute. *White v. Lee supra.* That purpose, expressed in both the national Highway Beautification Act, *see* 23 U.S.C.A. § 136 (West 1966), and in the present RSA 236:90, is the preservation of natural beauty along a highway. Accordingly, the serious damage that will qualify an automobile as "wrecked" must be damage to the appearance, as distinguished from the mechanical function, of the vehicle. The statute is concerned with the eyesore. Since a car may have an offensive appearance and still be worth repairing, repairability is not relevant to deciding what is seriously damaged. And since the identity of the owner does not affect the offensiveness of a car's appearance, the state of a car's title is likewise irrelevant in identifying a wrecked vehicle. Accordingly, we reject the defendant's position and hold that "wrecked automobile" may refer to one that appears to be seriously damaged.

■ Although the master did not expressly limit "damaged" vehicles subject to his injunction to those overtly and seriously damaged, the record of evidence indicates that he properly applied the statute as we have construed it. In his report he noted that on cross-examination the defendant had described certain vehicles then stored on the unfenced strip as having been in a "serious accident," having "rolled over in an accident," and having been "totalled in an accident and hit in the front and the sides," respectively. The evidence, moreover, included photographs of the area taken in 1981 and 1983 showing, *inter alia*, a sedan with smashed front, dented side, and missing fender, a station wagon with hood sprung and front bumper smashed and angled, not to mention other vehicles partially dismantled or listing to one side. There can be no serious question, then, that vehicles in the area were overtly and seriously damaged. Thus, the injunction against keeping such damaged vehicles was both consistent with the statute and warranted by the evidence.

■ As a second issue on appeal, the defendant claims that the master erroneously admitted evidence of activity at the site prior to the defendant's assumption of control over its operation. Unquestionably there was such evidence, and its relevance is not wholly clear. It may have come in as a result of initial confusion of the "Robert Bryant" named in the petition with the defendant's father,

Robert H. Bryant. We might speculate on other reasons. What is certain, however, is that the master based his recommendation only on what he found to be the facts at the relevant time during the defendant's operation of the junkyard. If, therefore, we assume that some of the evidence was inadmissible, it is clear that its introduction was not prejudicial to the defendant and that reversal would be unwarranted. *Ibey v. Ibey*, 94 N.H. 425, 427, 55 A.2d 872, 874 (1947); *see Gelinas v. Mackey*, 123 N.H. 690, 694, 465 A.2d 498, 500 (1983).

*Affirmed.*

All concurred.