STATE OF NEBRASKA, DEPARTMENT OF ROADS, APPELLEE, V. JACK
MELCHER, DOING DUSINESS AS J & B ENTERPRISES, APPELLANT,
AND LINCOLN COUNTY, NEBRASKA, INTERVENOR-APPELLEE.

483 N.W.2d 540

Filed May 1, 1992.    No. S-89-818.

David T. Schroeder, of Kelly, Kelly & Schroeder, for appellant.

Robert M. Spire, Attorney General, and K. Osi Onyekwuluje for appellee.

Joe W. Wright, Deputy Lincoln County Attorney, for intervenor-appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

The district court enjoined the defendant-appellant, Jack Melcher, doing business as J & B Enterprises, from maintaining certain operations which the plaintiff-appellee, State of Nebraska, Department of Roads, asserts constitute the use of real property as a junkyard, in violation of Neb. Rev. Stat. § 39-2601 et seq. (Reissue 1988). The intervenor-appellee, Lincoln County, avers that the operations also constitute use of the property as a junkyard or salvage yard, in violation of certain of its zoning regulations. Melcher claims, in summary, that the district court erred (1) in failing to declare the act unconstitutional, (2) in concluding that the evidence established a violation of the act and of the regulations, and (3) in failing to find that his past use of the property permits him to continue his operations. We reverse, and remand with direction.

## II. SCOPE OF REVIEW

As a suit for an injunction, this is an action in equity and, as

to matters of fact, is reviewed by an appellate court de novo on the record. *City of Newman Grove v. Primrose, ante* p. 70, 480 N.W.2d 408 (1992); Neb. Rev. Stat. § 25-1925 (Supp. 1991). In such review, the appellate court reaches a conclusion independent of the factual findings of the trial court; however, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstance that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *State v. Nebraska Assn. of Pub. Employees*, 239 Neb. 653, 477 N.W.2d 577 (1991).

However, as to questions of law, an appellate court has the obligation to reach its own independent conclusion. See *City of Newman Grove v. Primrose, supra*.

### III. FACTS

The property consists of approximately 5.96 acres of Lincoln County, which the record places at the northwest corner of Lincoln County road L56D and Interstate 80 at the Brady Interchange, mile marker 199, within 1,000 feet of the State's right-of-way.

Kent Peterson, a former in-law of Melcher's, leased the property from Rich and Virginia Peckham on December 10, 1968. Peterson then proceeded to build and operate a gas station, a drive-in diner, and a campground with restrooms for campers. Peterson later erected a steel building from which he operated a maintenance shop and, subsequent thereto, built a second gas station in front of the repair shop. All this was completed by 1970.

In order to attract business, Peterson placed several inoperable automobiles in front of his shop, "so it looked like someone was there." On occasion, travelers on the Interstate would leave their automobiles for repair, fail to pay, and abandon them. Peterson thought that one year he "ended up with just about 50 cars," although he did not leave all of them sitting on the property.

Through a series of photographs, Peterson identified vehicles and farm equipment which he had placed on the property in 1969 or 1970 and which were still in place as of the

date of trial, June 28, 1989. Although Peterson noted that there could be more vehicles than he could remember, he specifically recalled a "[t]hresher, corn sheller, [a] wagon [and a] pickup truck." When asked whether vehicles had been sitting on the property since 1969 or 1970 "in various states of repair or dismantling," Peterson responded in the affirmative. Moreover, according to Peterson, it was not uncommon for people to work on their own vehicles in the campground located on the property.

In 1972, Peterson subleased part of the property to Carol Shearer and her husband. Peterson testified that it was not uncommon for automobiles to be repaired outside the shop while the Shearers subleased the property. However, Carol Shearer testified that she had no knowledge of her husband repairing automobiles outdoors.

Peterson also attested that the Shearers operated the business as a junkyard, as they dismantled automobiles and sold parts. Carol Shearer admitted that she and her husband operated a maintenance garage on Peterson's property from August 1972 until September 1974, but claimed that there were no old, nonworking automobiles on the premises while they sublet the premises. Photographs taken in 1972 corroborate Shearer's testimony in this regard. In addition, several aerial photographs taken on May 14, 1973, depict approximately 12 automobiles on the property and, according to Shearer, show "no excess of any vehicles or any other trash." She stated further:

> When we moved there — when we moved in and when we moved out, the premises were kept tidy and neat at all times. My husband was very meticulous about having things neat. There was never anything left lying around. Motors were disposed of and tires were disposed of. It was never left in a mess.

After the Shearers left the property in 1974, Peterson managed the businesses until 1978. Melcher first subleased one of the gas stations in 1976 and purchased the property in 1982.

Peterson opined that the "general nature of the business" had not changed between 1969 and February 1978, when Melcher took over. Melcher also testified there was no substantial change in the nature of the business when he started

occupying the premises, except for the addition of a machine facility.

In approximately 1986 or 1987, Melcher began purchasing old military equipment. As a result of his growing collection of military vehicles, he formed the "Brady Museum Foundation," a Nebraska nonprofit corporation. Melcher set aside a portion of the property for the display of military and other vehicles.

When asked whether all of the automobiles on the premises were there for repairs, Melcher responded:

> Some of them are. Some of them are there because they are on a display status. In other words, we have some vehicles there that have been hit with land mines. People don't realize the force of a land mine so you have to have the bent iron in a sense, with the jagged edges to show the public what force a land mine has and what it can do.
>
> Some of the vehicles there, the people have asked to park them there to sell them. Some are waiting to be picked up after repairs. Some are my personally owned vehicles.

Melcher further testified that on occasion the police department asks him to pick up vehicles from the Interstate; he brings these to his property, where he puts them "in storage." Melcher asserted that he does not dismantle automobiles or sell parts from old vehicles. He claimed that as of the date of trial, only 5 of the 25 to 30 automobiles on the property were inoperable.

The most recent pictures show that in addition to vehicles, on the property there are a mobile home, a trailer camper, and other assorted objects such as tires, automobile parts, and miscellaneous equipment. Aerial photographs taken since 1978 reveal a substantial increase over a period of time in the number of automobiles dotting the property. A photograph dated May 3, 1978, shows approximately 10 vehicles on the property; a photograph dated March 11, 1981, shows approximately 23 vehicles; a photograph dated June 5, 1984, shows approximately 25 vehicles; and a photograph dated March 29, 1988, shows approximately 40 vehicles.

Noel Brown, a special permits technician with the Department of Roads, testified that until 1972, the Peterson

property was clean, "not junked up, you might say." Brown explained that between 1972 and 1984, the property began "to get an accumulation of acquired extra things." Finally, in 1984, Brown visited with Melcher because of the "vast accumulation of abandoned motor vehicles, other assorted nonferrous, dismantled, stored automobiles. It looked like an automobile graveyard." At that time, Brown suggested that Melcher get a permit to operate his business. However, Peterson testified that to his knowledge neither he nor Melcher ever operated the property as a junkyard or salvage yard. In any event, Melcher did not obtain a permit, so in 1987 Brown asked for a departmental review as to whether Melcher's use of the property was in violation of law. Nonetheless, Brown admitted that, as shown by photographs, approximately six of the vehicles which were on the property in 1969 or 1970 were still there in 1987, 1988, and 1989.

Bob L. Mann, who owns a cabin near the Melcher property, claimed that up to 1971 the property was in a clean state but that since that time the condition of the property has deteriorated. However, a number of witnesses, including Brown, testified that the general nature of the businesses conducted on the property has undergone no substantial change since their inception.

## IV. ANALYSIS

With the foregoing background, we are ready to analyze the various issues presented by Melcher's summarized assignments of error.

### 1. CONSTITUTIONALITY OF ACT

In connection with the first summarized assignment of error, Melcher claims that the definitions of "junk," "automobile graveyard," and "junkyard" contained in § 39-2602 are vague and overbroad, in violation of a constitutional provision or provisions which he does not identify in any way. Not only will a court ordinarily not consider constitutional challenges in the absence of a specification of the provision that is claimed to be violated, *State v. Burke*, 225 Neb. 625, 408 N.W.2d 239 (1987), but Melcher failed to comply with Neb. Ct. R. of Prac. 9E (rev. 1991), which requires that a "party presenting a case involving

the federal or state constitutionality of a statute must file and serve a separate written notice thereof with the Supreme Court Clerk at the time of filing such party's brief."

Accordingly, this appeal presents no constitutional issues for us to consider. *Line v. Line*, 228 Neb. 700, 423 N.W.2d 790 (1988); *Groene v. Commissioner of Labor*, 228 Neb. 53, 421 N.W.2d 31 (1988).

## 2. CLAIMED VIOLATIONS

### (a) The Act

The State claims Melcher is in violation of § 39-2603, which provides: "No person shall locate or maintain a junkyard, any portion of which is within one thousand feet of the nearest edge of the right-of-way of any interstate or primary highway, without obtaining a permit from the department."

### (i) Nature of Operations

Section 39-2602(3) defines "junkyard" as "an establishment or place of business which is maintained, operated or used for storing, keeping, buying or selling junk or for the maintenance or operation of an automobile graveyard, and includes garbage dumps and sanitary fills." Thus, in order to apply this statute to Melcher, the evidence must establish that he has an "establishment or place of business" in which he stores, keeps, buys, or sells junk, or which he operates or maintains as an automobile graveyard.

The origin of Nebraska's junkyard statute is found in 23 U.S.C. § 136 (1988), part of the federal Highway Beautification Act, which ties federal funding of state highways to state adherence to the requirements of the federal act. The stated purpose of the federal act is to "protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." § 136(a).

The declared purpose of Nebraska's act is to promote

public safety, health, welfare, convenience and enjoyment of public travel, to protect the public investment in public highways, and to preserve and enhance the scenic beauty of lands bordering public highways, it is declared to be in

the public interest to regulate and restrict the location and maintenance of junkyards . . . .

§ 39-2601.

It is with that declared purpose in mind that we examine the relevant definitions of our act, which are essentially identical to those of the federal act.

In performing that task we must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the act, rather than a construction defeating that purpose. *State v. Seaman*, 237 Neb. 916, 468 N.W.2d 121 (1991). Generally, when statutory language is plain and unambiguous, no judicial interpretation is needed to ascertain a statute's meaning, so that, in the absence of a statutory indication to the contrary, words used in a statute will be given their ordinary meaning. *State v. Salyers*, 239 Neb. 1002, 480 N.W.2d 173 (1992). However, a statute is open for construction when the language used requires interpretation or may reasonably be considered ambiguous. *Coleman v. Chadron State College*, 237 Neb. 491, 466 N.W.2d 526 (1991).

*State ex rel. State Highway Com'n v. Finch*, 664 S.W.2d 53 (Mo. App. 1984), involved a statutory definition identical to ours. The defendants therein were in the business of repairing machinery, building woodworking machinery, and repairing sawmill and pallet equipment. The undisputed evidence is that the property was littered with automobile parts, corrugated steel scraps, and trash. However, the defendants argued that as they neither bought nor sold junk, they were not in the junkyard or salvage yard business. The court found otherwise, writing:

It was sufficient, however, for the Commission to show, as it did, that the defendants were storing or keeping the junk on their premises. The definition of junkyard contained in § 226.660(4) [identical to Nebraska's definition] is satisfied not only by the buying or selling of junk but also by the storing or keeping of it on the area or place of business involved.

664 S.W.2d at 55, 56.

Our de novo review of the evidence persuades us that at no time did Melcher or his predecessors sell vehicles or other items for scrap, nor did they dismantle vehicles and sell the parts. We conclude from the testimony that the vehicles on the property have accumulated over the years as a result of the breakdowns of vehicles which the owners abandoned, the police requests that Melcher haul vehicles off the Interstate, the storage of vehicles, and the collecting of vehicles for display. Additionally, in the early days, Peterson placed automobiles on the lot for advertising purposes.

Nonetheless, in accordance with the rationale of *Finch*, we conclude that although Melcher is not in the business of buying and selling vehicles, he nonetheless maintains and operates an establishment which is used to store or keep vehicles.

The question thus becomes whether the activity constitutes a junkyard. In order for his operation to be such, he must maintain or operate an automobile graveyard, or store or keep junk.

### (ii) Nature of an Automobile Graveyard

As defined by the act, the phrase "automobile graveyard" refers, in relevant part, to an establishment used for storing "wrecked, scrapped, ruined or dismantled motor vehicles or motor vehicle parts." § 39-2602(2). Melcher's property can be considered an automobile graveyard only if his vehicles are described by one of the adjectives used in this definition.

"Wrecked" has been defined by a number of courts. Most recently, the Supreme Court of New Hampshire, in interpreting its version of the federal act, stated that " 'wrecked automobile' may refer to one that appears to be seriously damaged." *State v. Bryant*, 127 N.H. 69, 72, 498 A.2d 322, 324 (1985). The court reasoned that since the federal act is concerned with "preservation of natural beauty" along a highway, only automobiles which are externally and visibly damaged would fall under the statute. *Id.* Automobiles which are wrecked internally are not to be so considered. In *Nat. Cas. Co. v. Mitchell*, 162 Miss. 197, 203, 138 So. 808, 809 (1932), the court stated that "in ordinary speech an automobile is said to be wrecked when it is disabled or seriously damaged, although it

may not be totally destroyed or rendered incapable of use.". Finally, The American Heritage Dictionary 1393 (2d college ed. 1985) defines "wreck" as to "tear down or dismantle. . . . To bring to a state of ruin; disable or destroy."

The intent behind the subject act being to enhance the scenic beauty of lands bordering public highways, we conclude that the word "wrecked" relates to the outward appearance of a vehicle. Accordingly, a wrecked vehicle is one which is seriously damaged in its outward appearance.

The exhibits before us do not reveal any wrecked vehicles on Melcher's property.

Next, we consider the definition of "scrapped." "Scrap," as defined in The American Heritage Dictionary, *supra* at 1102, is "[d]iscarded waste material, esp. metal suitable for reprocessing." The definition of the verb is to "break down into parts for disposal or salvage." *Id*.

No cases defining "scrap" were found. However, several cases define "scrap metal," which definition is useful in considering the definition of a scrapped vehicle.

According to *Cooperage, Etc., Co. v. Rubinsky*, 180 Mich. 413, 147 N.W. 456 (1914), scrap metal does not include any material which can be repaired. " 'Scrap iron consists of old, worn-out, obsolete, broken, and cut iron or dismantled machinery, and parts thereof, entirely unfit for original use and having no commercial value except for remelting purposes.' " *Atchison, T. & S. F. Ry. Co. v. United States*, 98 F.2d 457, 458 (8th Cir. 1938). In *Sheftel v. People*, 111 Colo. 349, 356, 141 P.2d 1018, 1022 (1943), scrap metal is defined as metal which, "regardless of whether it is new and unused . . . has no peculiar value to those dealing in it by reason of its form or other inherent characteristic, except as material for remanufacture . . . ." From these cases, we conclude that a scrapped automobile is an automobile which has no value whatsoever as a vehicle, but the only worth of which is in the value of its metal for remelting or remanufacturing. As an example, an automobile which has been smashed by a compressor is a scrapped automobile.

None of the exhibits in the present case show vehicles on Melcher's property which satisfy the definition of "scrapped."

"Ruin" has a more readily understandable definition.

Returning to The American Heritage Dictionary, *supra* at 1076, we find the word is defined as the "[t]otal destruction or disintegration rendering something formless, useless, or valueless." The verb "ruin" is to "destroy or demolish completely" or to "harm irreparably." *Id.* Thus, a ruined vehicle is one which, through destruction or disintegration, has become formless, useless, or valueless.

Again, the exhibits here do not indicate that there are any ruined vehicles on the Melcher property.

Finally, an automobile graveyard may be evidenced by the presence of dismantled vehicles. "Dismantle" means to "strip of furnishings or equipment. . . . To put an end to in a gradual systematic way." The American Heritage Dictionary, *supra* at 406. The photographs of Melcher's property reveal that there are a few dismantled automobiles. One photographic exhibit shows a blue sedan missing a door, side panels, and a hood. Another depicts a blue automobile without doors and without a roof over the passenger compartment. Yet another photograph portrays the frame of a military vehicle, but this may be one of the vehicles Melcher was repairing. No other dismantled vehicles are shown on the photographic exhibits.

Thus, we must conclude that while none of the vehicles on Melcher's property are scrapped, ruined, or wrecked, several are dismantled. Consequently, Melcher's property partially meets the definition of an automobile graveyard, a definition which takes a narrow approach and covers no more than two or three of Melcher's vehicles.

### (iii) Nature of Junk

As defined in the act, "junk" is "old or scrap copper, brass, rope, rags, batteries, paper, trash, rubber debris, waste or junked, dismantled, or wrecked automobiles . . . ." § 39-2602(1).

An Ohio court has defined "junked automobiles" as those "hav[ing] outlived their usefulness as automobiles and . . . entered the state of waste or discarded material." *Goodman v. Youngstown*, 24 Ohio L. Abs. 696, 699 (1937). The Alaska Supreme Court has defined "junk car" as "one which cannot be economically repaired." *Osness v. Dimond Estates, Inc.*, 615

P.2d 605, 608 (Alaska 1980).

The common usage of the verb "junk" is to "throw away or discard as useless; scrap." The American Heritage Dictionary, *supra* at 694. *City of Shelton v. Simone*, No. CV89-02-83-08S, 1990 WL 261981, at *1 (Conn. Super. Nov. 7, 1990), suggests that junked automobiles are "unregistered motor vehicles which are no longer intended or in condition for legal use upon the public highway." We conclude that junked vehicles are those no longer intended or in condition for legal use upon a public highway. The registration status is a factor to be considered on the issue of the intent to use the vehicle.

Under these definitions, the vehicles on Melcher's property are junked. Not only have a number of the vehicles been sitting on the property since 1969 or 1970, other vehicles, a mobile home, and a trailer camper have been sitting on the property for an extended period of time. The vehicles are not being used for parts, nor are they being rebuilt. Rather, with the possible exception of those which are part of the museum display, they merely sit on the property, serving no useful function or economic purpose. As Melcher articulated no plan for using these antiquated automobiles and trailers, they can only be defined as junk.

The State's case in this regard is further enhanced by the considerable accumulation of tires, automobile parts, and miscellaneous machinery which sits on the property. When these smaller items are considered in combination with the approximately 30 vehicles on the property, the State has more than satisfied its burden of showing that Melcher is operating without a permit an establishment which is used for the storage or keeping of junk.

We therefore conclude from our de novo review of the evidence that Melcher's use of the property is in violation of § 39-2603.

### (b) The Regulations

The Lincoln County zoning regulations do not list either a junkyard or a salvage yard as a permitted use at the location in question. Lincoln County Zoning Regulations art. III, § 3.51 (1983), defines junk or salvage yard as:

> A lot, parcel or tract of land, including buildings, used primarily for the collection, storage and sale of waste paper, rags, scrap metal, or other discarded material; or for the collecting, dismantling, storage *and* salvaging of machinery or vehicles not in running condition, or for the sale of parts thereof.

(Emphasis supplied.)

Under this definition, Melcher's property cannot be described either as a junkyard or as a salvage yard. The use of the conjunctive "and" implies that either facility must collect, dismantle, store, *and* salvage the vehicles; that is, all four things listed must be done. As stated in *In re Petition of G. Kay, Inc.*, 219 Neb. 24, 26, 361 N.W.2d 182, 184 (1985), quoting *Rapid Film Service, Inc. v. Bee Line Motor Freight*, 181 Neb. 1, 146 N.W.2d 563 (1966):

> "We believe the correct interpretation of the language involved herein, in context, is that the word 'and' means along with, also, or as well as. The word 'and' is 'A conjunction connecting words or phrases expressing the idea that the latter is to be added or taken along with the first.' Black's Law Dictionary (4th Ed.), p. 112. . . ."

The evidence presented in this case does not demonstrate that Melcher used his property primarily for dismantling, collecting, storing, and salvaging vehicles. As a result, the definition does not encompass Melcher's activities.

However, Lincoln County Zoning Regulations art. XXXII, § 32.3 (1983), also prohibits the "permanent outside repair or repair storage" of automobiles, the violation of which is a nuisance. The evidence persuades us that from the inception of the businesses in 1969, outside repair has been done at least by Peterson, Melcher, and people who "would want to work on their own equipment as they came through." Thus, Melcher's operations contravene this regulation.

### 3. EFFECT OF EARLIER USE

#### (a) With Respect to Act

Section 39-2606 provides that a

> junkyard lawfully in existence on August 27, 1971, which is within one thousand feet of the nearest edge of the

right-of-way and visible from the main-traveled way of any interstate or primary highway shall be screened by the department so as not to be visible from the main-traveled way of such highway, the cost of which shall be paid in full by the department.

Thus, the issue is whether Melcher has established that the property was a junkyard prior to passage of the act. See *Cossell v. Hempfield Township*, 106 Pa. Commw. 404, 526 A.2d 475 (1987) (landowners have burden of proving that a lawful nonconforming use existed at time ordinance was established). The difficulty with providing an answer to whether a junkyard existed prior to the passage of the act is in the need to determine the amount of junk required to make a junkyard.

Although the act does not provide a direct answer, its purpose to improve the aesthetic appearance of major roadways suggests that perhaps the act was intended to prohibit the presence of even a single junked vehicle within 1,000 feet of an interstate or other primary highway. Further guidance is found in the law of other jurisdictions.

Under a local ordinance in Hempfield Township, Pennsylvania, property " 'having one (1) or more used, unlicensed and inoperable automobiles or other vehicles thereon shall in any event be deemed a "junkyard" . . . .' " *Cossell v. Hempfield Township*, 526 A.2d at 478. Kittery, Maine's ordinance provides that an automobile graveyard exists when the property has three or more unserviceable, discarded, wornout, or junked motor vehicles. *Town of Kittery v. Dineen*, 591 A.2d 236 (Me. 1991). Sandgate, Vermont's ordinance prohibits the storage of junk cars, which is " 'more than one inoperable motor vehicle . . . stored on any lot for a period in excess of thirty days unless within a building or totally screened from view . . . .' " *Town of Sandgate v. Colehamer*, 156 Vt. 77, 80, 589 A.2d 1205, 1207 (1990). The Kentucky junkyard statute forbids any property from having five or more " 'junked, wrecked or nonoperative automobiles' " without a permit. *Dawson v. Com., Dept. of Transp., Etc.*, 622 S.W.2d 212, 214 (Ky. 1981). Finally, *City of Shelton v. Simone*, No. CV89-02-83-08S, 1990 WL 261981 (Conn. Super. Nov. 7, 1990), only requires two automobiles to be on the premises in

order to be defined as a junkyard.

Thus, although the act does not set the specific number of junked vehicles needed to constitute a junkyard, a review of other statutes and ordinances affirms that in some cases only one such vehicle is necessary.

Without establishing the exact number of junked vehicles required to constitute a junkyard, it suffices to say that the evidence presented establishes to our satisfaction that there were at least four to six inoperable vehicles, in addition to several pieces of old farm equipment, on the property prior to August 27, 1971.

Consequently, the property was a junkyard before the act was adopted and falls within the protection provided by § 39-2606. Melcher therefore may continue to use the property as he has in the past; it is the State's obligation to screen the property from public view, as required by that section of the act.

### (b) With Respect to Regulations

Lincoln County is bound by Neb. Rev. Stat. § 23-173.01 (Reissue 1991), which provides: "The use of a building, structure, or land, existing and lawful at the time of the enactment of a zoning regulation . . . may, except as provided in this section, be continued, although such use does not conform with the provisions of such regulation . . . ."

The zoning regulations involved were enacted on June 13, 1983. As noted in part IV 2(a)(iii), the evidence persuades us that prior to this date vehicles were repaired outside. We are additionally persuaded that vehicles were stored on the property before that date. Consequently, Melcher may continue to do as he has done.

### V. RULING

Because of the past use of the property, we, as first said in part I, reverse the judgment of the district court. We further remand with the direction that the district court vacate its injunction and dismiss the cause both as to the State and the county.

REVERSED AND REMANDED WITH DIRECTION.