OMAHA PUBLIC POWER DISTRICT, A NEBRASKA POLITICAL
SUBDIVISION, APPELLEE, V. NEBRASKA DEPARTMENT OF REVENUE
AND M. BERRI BALKA, TAX COMMISSIONER, APPELLANTS.
NEBRASKA PUBLIC POWER DISTRICT, A NEBRASKA PUBLIC
CORPORATION AND POLITICAL SUBDIVISION, APPELLEE, V.
NEBRASKA DEPARTMENT OF REVENUE AND M. BERRI BALKA,
TAX COMMISSIONER, APPELLANTS.

537 N.W.2d 312

Filed September 8, 1995.   No. S-93-1100.

Don Stenberg, Attorney General, and L. Jay Bartel for appellants.

Norman H. Wright and Michael J. Mooney, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee Omaha Public Power District.

Robert A. Green for appellee Nebraska Public Power District.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

WRIGHT, J.

Omaha Public Power District (OPPD) and Nebraska Public Power District (NPPD) filed claims for tax credits under the Employment Expansion and Investment Incentive Act (the Act). The state Tax Commissioner (Commissioner) denied the claims. On appeal, the district court for Lancaster County reversed the orders of the Commissioner and remanded the matters for a determination of the amount of credits, if any, to which OPPD and NPPD might be entitled. The Commissioner and the Department of Revenue (Department) appeal.

## SCOPE OF REVIEW

Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *Vervaecke v. State*, 247 Neb. 707, 529 N.W.2d 779 (1995); *State ex rel. Perkins Cty. v. County Superintendent*, 247 Neb. 573, 528 N.W.2d 340 (1995); *In re Application of City of Grand Island*, 247 Neb. 446, 527 N.W.2d 864 (1995).

Tax exemption provisions are strictly construed, and their operation will not be extended by construction. Property which is claimed to be exempt must clearly come within the provision

granting exemption from taxation. *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal.*, 237 Neb. 1, 465 N.W.2d 111 (1991); *Indian Hills Comm. Ch. v. County Bd. of Equal.*, 226 Neb. 510, 412 N.W.2d 459 (1987); *Bethphage Com. Servs. v. County Board*, 221 Neb. 886, 381 N.W.2d 166 (1986). Since a statute conferring an exemption from taxation is strictly construed, one claiming an exemption from taxation of the claimant or the claimant's property must establish entitlement to the exemption. *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal.*, supra; *Nucor Steel v. Leuenberger*, 233 Neb. 863, 448 N.W.2d 909 (1989). See *Bethphage Com. Servs. v. County Board*, supra.

## FACTS

The basic facts in this case are not in dispute. OPPD and NPPD (collectively referred to as "the utilities") are political subdivisions of the State of Nebraska. The utilities were created and operate by virtue of chapter 70, article 6, of the Nebraska Revised Statutes, each providing electrical power within its chartered territory.

NPPD operates an electrical utility system and generates, transmits, distributes, and sells electricity within its chartered territory, which comprises 86 of Nebraska's 93 counties and portions of 5 other counties. NPPD pays Nebraska sales and use taxes upon taxable products and services it purchases. During 1989, NPPD increased the number of employees in its business by 46 new full-time employees, as determined in accordance with Neb. Rev. Stat. § 77-27,190 (Reissue 1990), and increased its capital investment in Nebraska by $33,778,915, as determined in accordance with Neb. Rev. Stat. § 77-27,191 (Reissue 1990). Pursuant to the Act, Neb. Rev. Stat. §§ 77-27,187 to 77-27,196 (Reissue 1990), NPPD filed a claim for tax credits in the amount of $519,000 for taxes paid during 1990.

OPPD was chartered for the purpose of generating, distributing, and selling electricity to consumers in a 13-county area in eastern Nebraska. In 1989, OPPD increased its average number of employees by 163 full-time employees and increased its qualified investment by $125,219,587.81. In 1990, OPPD

increased its employees by 81 full-time employees and increased its qualified investment by $85,374,048.90. In 1991, OPPD increased its employees by 37 full-time employees and increased its qualified investment by $78,039,515.95. Based upon these increases in employees and capital investment, OPPD filed a claim for refund of sales and use taxes paid during 1990, 1991, and 1992 in the amount of $4,268,500.

M. Berri Balka is the Commissioner, and the Department is an agency of the state created pursuant to Neb. Rev. Stat. § 77–360 (Reissue 1990). The Department contested the utilities' claims, asserting that their activities involved the generation and distribution of electricity and, therefore, did not constitute the "manufacture" of "tangible personal property" under the Act and that the generation and distribution of electricity is not a "qualifying business" under the Act. The Department also contested the claims on the basis that the utilities improperly calculated credits claimed due on a statewide basis. The Department argued that because the utilities' business operations are conducted in multiple locations, they do not constitute a single business location for purposes of computing credits in accordance with the Act.

A consolidated hearing on the claims was held before the Department's designated hearing officer. Following the hearing, the Commissioner denied the claims. The Commissioner found that the generation of electricity is considered a service and, therefore, is not a "qualifying business" for purposes of the Act. The Commissioner did not address whether the activities of the utilities constituted a single business location for purposes of calculating credits under the Act.

The utilities sought judicial review in the district court under the Administrative Procedure Act, Neb. Rev. Stat. §§ 84–901 through 84–920 (Reissue 1994). The court concluded that in Nebraska, electricity is considered a product or commodity which is manufactured. The court reversed the Commissioner's orders and remanded the matters to the Commissioner for a determination as to the amount of credits, if any, to which the utilities might be entitled. The court also noted that the issue of whether the utilities' activities constituted a single business location had not been addressed by the Commissioner.

## ASSIGNMENTS OF ERROR

The Commissioner and the Department allege that the district court erred in finding that the generation of electricity constituted the manufacture of tangible personal property, in finding that the utilities were engaged in a qualifying business under the Act, and in remanding the actions for further proceedings before the Commissioner to determine whether the utilities' activities were conducted at a single business location or multiple business locations for purposes of computing credits under the Act.

## ANALYSIS

The issue presented is whether the generation and distribution of electricity by the utilities constitute the manufacture of tangible personal property within the meaning of the Act. Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *Vervaecke v. State*, 247 Neb. 707, 529 N.W.2d 779 (1995). We note that tax exemption provisions are strictly construed. See *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal.*, 237 Neb. 1, 465 N.W.2d 111 (1991). One claiming an exemption from taxation of the claimant or the claimant's property must establish entitlement to the exemption. *Id.*

The Act originated in 1986 Neb. Laws, L.B. 1124. Section 77–27,188 provides for credits against taxes imposed by the Nebraska Revenue Act of 1967 to any taxpayer engaged in a qualifying business described in § 77–27,189, which stated:

A qualifying business shall mean any business engaged in the activities listed in subdivisions (2)(a) to (g) of this section or in the storage, warehousing, distribution, transportation, or sale of tangible personal property, except that qualifying business shall not include any business activity in which eighty percent or more of the total sales are sales to the ultimate consumer of tangible personal property which is not (1) assembled, fabricated, manufactured, or processed by the taxpayer or (2) used by the purchaser in any of the following activities:

(a) The assembly, fabrication, manufacture, or processing of tangible personal property;

(b) The feeding or raising of livestock;

(c) The conducting of research, development, or testing for scientific, agricultural, animal husbandry, or industrial purposes;

(d) The performance of data processing, telecommunication, insurance, or financial services;

(e) Farming or ranching;

(f) The administrative management or the headquarters of any of the activities listed in subdivisions (a) to (e) of this subdivision or any activity excluded solely because of its retail sales; or

(g) Any combination of the activities listed in this section.

The Commissioner concluded that the generation of electricity is a service and, therefore, not a qualifying business under the Act. The district court concluded, as a matter of statutory interpretation, that the generation of electricity is the manufacture of tangible personal property as contemplated by the Act. To decide this case, we must determine whether the generation and distribution of electricity is a service or is the manufacture of tangible personal property.

The district court relied upon *State, ex rel. Spillman, v. Interstate Power Co.*, 118 Neb. 756, 226 N.W. 427 (1929). The district court concluded that it was required to follow our holding that electricity is a commodity, interpreting our holding to mean that the generation of electricity by OPPD and NPPD is the manufacture of tangible personal property. The district court then concluded that OPPD and NPPD are qualifying businesses under the Act.

### ANALYSIS OF *SPILLMAN*

Whether electricity is tangible personal property for purposes of the Act is not controlled by our decision in *Spillman*, which must be observed in its particular setting. In *Spillman*, we held that electricity was a commodity "in the language of everyday life and in the strictly commercial sense of the term." 118 Neb. at 771, 226 N.W. at 433. The plaintiff's petition sought to

enjoin the defendants from putting into force a schedule of rates for electricity for the unlawful purpose of destroying the business of a competitor. The statute upon which the plaintiff relied was directed against those

> "engaged in the production, manufacture or distribution of any commodity in general use that shall intentionally, for the purpose of destroying the business of a competitor in any locality, discriminate between different sections, communities, or cities of this state by selling such commodity at a lower rate in one section, community or city, than is charged for said commodity by said party in another section, community or city, after making due allowance for the difference, if any, in the grade or quality and in the actual cost of transportation from the point of production . . . ."

*Spillman*, 118 Neb. at 765, 226 N.W. at 431. Interstate Power Company contended that electricity or electrical energy which was supplied by them was not a commodity or a manufactured product as the terms were employed in the provisions of the laws of Nebraska upon which the State relied. We concluded that

> in the language of everyday life and in the strictly commercial sense of the term, "electricity" is "produced," "stored," "measured," "bought and sold." It is moved or transported from place to place in containers or by cable. It is something that one trades or deals in. We buy it and pay for it and determine the amount of our purchases by definite and well–understood "standard."

*Id*. at 771, 226 N.W. at 433. We noted that as a matter of strict definition, electricity, in the commercial sense of the term, was included within the literal terms of the statute upon which the State relied. However, neither the statute relied on in *Spillman* nor the term "commodity" applies to the case at bar.

Our definition of electricity in *Spillman* does not make clear whether electricity falls within the general definition of tangible personal property for purposes of the Act. As noted by the Commissioner, electricity is a physical phenomenon; it is energy, not matter, and has no mass. Electricity can hardly be called "tangible," which means "capable of being touched." See Webster's Encyclopedic Unabridged Dictionary of the English

Language 1452 (1989). A statute is open for construction when the language used requires interpretation or may reasonably be considered ambiguous. *State v. Melcher*, 240 Neb. 592, 483 N.W.2d 540 (1992).

Even if we accepted the definition of electricity in *Spillman* as authoritative, the Legislature has since changed the law. *Spillman* was issued in 1929. In 1967, the Legislature enacted the Nebraska Revenue Act of 1967. The Legislature did not use the term "commodity" to describe electricity. It treated public utilities separately from the manufacture of tangible personal property within the provisions of chapter 77. It is obvious that the Legislature, in adopting the Nebraska Revenue Act of 1967, intended to make some change in the existing law. See *No Frills Supermarket v. Nebraska Liq. Control Comm.*, 246 Neb. 822, 523 N.W.2d 528 (1994).

## AMBIGUITY OF § 77-27,189

Neb. Rev. Stat. § 77-101 (Cum. Supp. 1994) provides: "For purposes of Chapter 77 and any statutes dealing with taxation, unless the context otherwise requires, the definitions found in sections 77-102 to 77-122 shall be used." Tangible personal property is defined in Neb. Rev. Stat. § 77-105 (Cum. Supp. 1994) as follows: "[T]angible personal property includes all personal property possessing a physical existence, excluding money." However, neither electricity nor tangible personal property is defined in the Act itself.

Since electricity is not specifically included or excluded as tangible personal property within the Act, we must interpret the Act. The interpretation of a statute requires the court to "determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. . . . [E]ffect must be given, if possible, to all the several parts of a statute." *NC+ Hybrids v. Growers Seed Assn.*, 219 Neb. 296, 299, 363 N.W.2d 362, 365 (1985). In order for the utilities to qualify under the provisions of the Act, the purpose of the Legislature must have been to treat the generation and distribution of electricity as the manufacture of tangible personal property. If the generation of electricity is a service, then the

utilities are not qualifying businesses within the meaning of the Act.

Whether the generation of electricity is the manufacture of tangible personal property is a question of first impression in Nebraska. A scientific discussion of the properties of electricity, while informative, is legally inconclusive and is not the way in which we will consider the question. Instead, we will consider the legislative history of the Act, and chapter 77 of the Nebraska Revised Statutes, in which the Act is found.

### LEGISLATIVE HISTORY

"To ascertain the intent of the Legislature, a court may examine the legislative history of the act in question." *Georgetowne Ltd. Part. v. Geotechnical Servs.*, 230 Neb. 22, 28, 430 N.W.2d 34, 39 (1988). The purpose of the Act is to encourage and reward the development and expansion of business in the state. The Act was not intended to provide a tax credit for all businesses that increased employment and investment, but was limited to those businesses specifically described in § 77-27,189. When the Act was amended in 1987, the Legislature's intent was discussed at the Revenue Committee hearing.

> In recent years, not too many new manufacturers, assemblers, or food processors have come into our state. So, actually, we're . . . we're offering this tax incentive to a few people. Most growth in recent years has been in services and retailers. By excluding retailers and service businesses we are preserving the opportunity for growth in our tax base. It has been said that new employees coming into manufacturing take five more people in services and in the retail sector to support them.

Revenue Committee Hearing, L.B. 270, 90th Leg., 1st Sess. 37 (Feb. 19, 1987). The Act was thereafter amended by 1987 Neb. Laws, L.B. 270. At the same time, the Legislature also passed 1987 Neb. Laws, L.B. 775, the Employment and Investment Growth Act, now codified as Neb. Rev. Stat. §§ 77-4101 to 77-4112 (Reissue 1990 & Cum. Supp. 1994).

A comment by Senator Elroy Hefner during the floor debate on L.B. 270 reads as follows:

This will give incentive to potential investment to create new jobs in Nebraska at a time when the state badly needs a boost in its economy. It requires a present or a new employer to make a significant investment initially. This would be the $100,000 minimum, and at the same time requires that at least two new jobs be created. These would be primary jobs. We know when we create primary jobs it adds to the secondary jobs. . . . It's the creation of primary jobs that will allow for the . . .

. . . .

. . . creation of other jobs which serves [sic] the primary jobs. Let's remember that these new employees have to pay income tax and sales tax on the services that they use. Those employees will need services, and in turn those services will hire other people. So it really does have a multiplying effect.

Floor Debate, 90th Leg., 1st Sess. 3725 (Apr. 22, 1987).

In passing the Act, the Legislature intended to encourage the creation of what were referred to as "primary jobs," as opposed to the services that would support the primary jobs. The credits were to be used to provide an incentive to create new jobs in Nebraska and boost its economy. Our reading of the legislative history leads us to conclude that the Legislature's purpose in passing and amending the Act was to benefit those businesses that would increase Nebraska's capacity to produce economic goods rather than services.

INTERPRETATION OF CHAPTER 77

As pointed out by the Commissioner, the Legislature has historically treated public utilities separately from retailers of tangible personal property within the context of the Nebraska sales and use tax laws. In 1967, in the original draft of a bill defining tangible personal property, the Legislature included electricity within the definition of tangible personal property, but later amendments to the bill eliminated electricity from the definition. See 1967 Neb. Laws, ch. 487, § 2, p. 1543. Sales made by utilities and sales made by retailers are treated as separate types of transactions. The sales tax is imposed separately on sales of tangible personal property and the gross

receipts from public utilities.

For example, Neb. Rev. Stat. § 77–2703(1) (Cum. Supp. 1992) provides: "There is hereby imposed a tax at the rate provided in section 77–2701.02 upon the gross receipts from all sales of tangible personal property sold at retail in this state, the gross receipts of every person engaged as a public utility . . . ." Neb. Rev. Stat. § 77–2705(2) (Cum. Supp. 1992) provides: "Every person furnishing public utility service as defined in subsection (2) of section 77–2702.07 shall register with the Tax Commissioner . . . ." Neb. Rev. Stat. § 77–2704.13 (Cum. Supp. 1992) provided:

> Sales and use taxes shall not be imposed on the gross receipts from the sale . . . of:
>
> . . . .
>
> (2) Sales and purchases of such energy sources or fuels made before October 1, 1991, or after September 30, 1992, when more than fifty percent of the amount purchased is for use directly in processing, manufacturing, or refining tangible personal property, in the generation of electricity, or by any hospital.

This section lists the generation of electricity separately from the processing, manufacturing, or refining of tangible personal property and contains a ceiling on the amount of tax that applies to manufacturers of tangible personal property, but not on taxes applying to generators of electricity. Had the Legislature considered the operation of utilities to be the same as the business of manufacturing tangible personal property, there would have been no reason to separate utilities from the general language relating to tangible personal property.

The Department has paralleled the Legislature's intent to treat electricity as a service in Nebraska Sales and Use Tax Regulation 1–066.01, 316 Neb. Admin. Code, ch. 1, § 066.01 (1983):

> The sales or use tax applies to all retail sales of gas (natural or artificial), electricity, sewer, and water by a public utility except for certain enumerated exemptions under the Nebraska Revenue Act of 1967, as amended. "Public utility" for purposes of this regulation, shall mean any person transmitting, distributing, or furnishing gas,

electric, sewer, and water service to the public over or through a distribution system of wires, cables, conduits, pipes, mains, services, bottles, etc.

Nebraska Department of Revenue Ruling 1-86-1 (Jan. 7, 1986) states that electricity is not considered tangible personal property for purposes of the Nebraska sales and use tax laws. In *McCaul v. American Savings Co.*, 213 Neb. 841, 331 N.W.2d 795 (1983), we held that although construction of a statute by a department charged with enforcing it is not controlling, considerable weight will be given to such a construction, particularly when the Legislature has failed to take any action to change such an interpretation.

The Department classifies electricity as a service and applies a use tax. See 316 Neb. Admin. Code, ch. 1, §§ 066.01 and 066.02 (1983). Agency regulations properly adopted and filed with the Secretary of State of Nebraska have the effect of statutory law. *Slack Nsg. Home v. Department of Soc. Servs.*, 247 Neb. 452, 528 N.W.2d 285 (1995). Deference is accorded to an agency's interpretation of its own regulations unless plainly erroneous or inconsistent. *Id.*

At this point, we must consider the burden that the utilities must sustain to prevail in their arguments. In the present case, although the Act describes a tax credit, for purposes of our analysis, we treat it the same as a tax exemption. Tax exemption provisions are strictly construed, and their operation will not be extended by construction. *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal.*, 237 Neb. 1, 465 N.W.2d 111 (1991). Property which is claimed to be exempt must clearly come within the provision granting exemption from taxation. *Id.* Since a statute conferring an exemption from taxation is strictly construed, one claiming an exemption must establish entitlement to the exemption. *Id.*

As we look at the manner in which electricity has been treated for taxation purposes within chapter 77, we find that the Legislature has categorized utilities as a service rather than tangible personal property. Effect must be given, if possible, to all the several parts of a statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided. *State ex rel. Perkins Cty. v. County Superintendent*,

247 Neb. 573, 528 N.W.2d 340 (1995). Had the Legislature intended to treat electricity as tangible personal property, then the parallel provisions of chapter 77 would be superfluous.

In construing a statute, a court must look to the statute's purpose and give to the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it. See *In re Guardianship & Conservatorship of Bloomquist*, 246 Neb. 711, 523 N.W.2d 352 (1994). "Further, the components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of an act are consistent, harmonious, and sensible." *Fecht v. The Bunnell Co.*, 243 Neb. 1, 3, 497 N.W.2d 50, 52 (1993). We conclude that as a general rule, chapter 77 singles out the generation of electricity for treatment separate from the treatment afforded tangible personal property. We cannot escape the conclusion that the Legislature intends the generation of electricity to be treated as a service.

## CONCLUSION

Our review of the statutes, the interpretation of such statutes by regulation, and the legislative history of the Act indicate that electricity is not tangible personal property for tax purposes. We find that for purposes of the Act, the generation of electricity is a service, not the manufacture of tangible personal property, and that the utilities are not entitled to tax credits pursuant to the Act.

The Commissioner correctly determined that the generation of electricity is a service and, therefore, not a "qualifying business," and the Commissioner was correct in disallowing the credits claimed by the utilities. The district court erred in determining that for purposes of the Act, electricity was tangible personal property. The judgment of the district court is reversed, and the cause is remanded to that court with directions to affirm the orders denying the claims of the utilities.

REVERSED AND REMANDED WITH DIRECTIONS.

CAPORALE, J., concurring.

While I agree with the majority's judgment, and agree as well that *State, ex rel. Spillman, v. Interstate Power Co.*, 118

Neb. 756, 226 N.W. 427 (1929), does not apply, I respectfully disagree with the remainder of the majority's analysis; thus, I write separately.

The adjudication of this case rests on a far simpler rationale than that employed by the majority. Given the rule that absent anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning, *Dillard Dept. Stores v. Polinsky*, 247 Neb. 821, 530 N.W.2d 637 (1995), there is no ambiguity in the definition of the phrase "tangible personal property" contained in Neb. Rev. Stat. § 77–105 (Cum. Supp. 1994).

In the ordinary sense, the phrase "tangible property" describes objects having a physical substance apparent to the senses. Webster's Third New International Dictionary, Unabridged 2337 (1981). Electricity, that is to say, electrical energy, has no such physical substance in the sense that those two words are commonly understood in everyday parlance. While under certain circumstances one can feel the presence of electricity, and it can be stored and measured, it has no readily discernible physical form in the sense that do items such as axes, books, cloth, desks, elevators, fiddles, gavels, and the like. To paraphrase a justice of the U.S. Supreme Court,

> [O]ur job is not to scavenge the world of English usage to discover whether there is any possible meaning of "[tangible personal property]" which . . . includes [electricity]; our job is to determine whether the *ordinary* meaning includes [it], and if it does not, to ask whether there is any solid indication in the text or structure of the statute that something other than ordinary meaning was intended.

(Emphasis in original.) *Chisom v. Roemer*, 501 U.S. 380, 410, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991) (Scalia, J., dissenting).

The ludicrous results obtainable by relying upon legislative sources to examine the meaning of unambiguous statutory language are illustrated by one writer thusly:

> Consider, for example, whether a statute providing for the leashing of "dogs" also requires the leashing of cats (because the statute really covers the category "animals")

> or wolves (because the statute really covers the category "canines") or lions ("dangerous animals"). Most people would say that the statute does not go beyond dogs, because after all the verbal torturing of the words has been completed it is still too plain for argument what the statute means. Perhaps it is a quibble, but in my terminology this becomes a decision that the statute "applies" only to dogs. For rules about the rest of the animal kingdom we must look elsewhere.

Frank H. Easterbrook, *Statutes' Domains*, 50 U. Chi. L. Rev. 533, 535 (1983).

In this case, there is no statutory indication that anything other than the ordinary meaning of tangible personal property was intended. That being so, the majority's analysis should have ended with the determination that electricity is not tangible personal property as such is defined in § 77–105. See *State v. Chambers*, 242 Neb. 124, 493 N.W.2d 328 (1992) (when words of statute not ambiguous, interpretation not only not necessary but will not be indulged).

However, because the majority elected to refer to what it characterizes as the "legislative history" in order to ascertain the meaning of the words used in § 77–105, more must be written about the nature of legislative sources and their use by courts in the process of construing ambiguous statutory language.

I agree that changes made in statutory wording and the treatment afforded a topic in related enactments constitute a legislative history which provides reliable insights as to the intended meaning of ambiguous legislation. However, I respectfully submit that the situation is otherwise with respect to the remaining general record made by a legislature in the process of enacting a statute. Other than amendments actually made to the proposed statutory language during the process of its enactment and the enacted language itself, the general legislative record provides no such reliable insights.

For example, the majority's reliance upon the general legislative record includes a citation to a committee hearing report and a comment made during the floor debate of the statute. Neither is a reliable source for determining the intent of

the Legislature as a body. As for committee reports, to again paraphrase the same U.S. Supreme Court justice referred to previously:

> Assuming that all the members of the . . . committees in question . . . actually adverted to the interpretive point at issue here—which is probably an unrealistic assumption—and assuming further that they were in *unanimous* agreement on the point, they would still represent [a vast minority]. It is most unlikely that many [legislators] read the pertinent portions of the Committee Reports before voting on the bill—assuming (we cannot be sure) that the Reports were available before the vote.

(Emphasis in original.) *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 620, 111 S. Ct. 2476, 115 L. Ed. 2d 532 (1991) (Scalia, J., concurring in the judgment). As it is doubtful that the details set forth in a committee report come to the attention of the entire Legislature, it is even more doubtful that they are approved by it. *Hirschey v. F.E.R.C.*, 777 F.2d 1 (D.C. Cir. 1985) (Scalia, J., concurring).

Far less reliable, as sources of statutory meaning,

> are remarks made during floor debate—even "authoritative" explanations offered by a bill's sponsors. While a sponsor's statements may reveal *his* understanding and intentions, they hardly provide definitive insights into [the legislative body's] understanding of the meaning of a particular provision. Few of his fellow legislators will have been on hand to hear the gloss the sponsor may have placed on a particular provision. Thus members of [the body], in voting on a measure, must be presumed to have relied on the meaning of the words read in context on a printed page. Moreover, a statute's sponsor may well be pursuing a political agenda in his floor discussion that judges are ill-equipped to detect.

(Emphasis in original.) *Overseas Educ. Ass'n, Inc. v. FLRA*, 876 F.2d 960, 975 (D.C. Cir. 1989) (Buckley, J., concurring). See W. David Slawson, *Legislative History and the Need to Bring Statutory Interpretation Under the Rule of Law*, 44 Stan. L. Rev. 383 (1992). In the words of one jurist, "To single out a senator's statement in the legislative chamber and then

transform that statement into the collective voice of the Legislature is unquestionably farfetched." *Bahensky v. State*, 241 Neb. 147, 151, 486 N.W.2d 883, 886 (1992) (Shanahan, J., dissenting).

As a consequence, I have come to understand and agree with the observation that "[i]f one were to search for an interpretive technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history." (Emphasis in original.) *Conroy v. Aniskoff*, 507 U.S. 511, 113 S. Ct. 1562, 1567, 123 L. Ed. 2d 229 (1993) (Scalia, J., concurring in the judgment).

Equally bothersome is that the use of the general legislative record provides an incentive for legislators to distort it. It allows for the injection of their own desired interpretations on the meaning of a particular statute while evading the normal democratic process. *Int. Broth. of Elec. Wkrs., Loc. U. 474 v. NLRB*, 814 F.2d 697 (D.C. Cir. 1987) (Buckley, J., concurring); *Wallace v. Christensen*, 802 F.2d 1539 (9th Cir. 1986) (Kozinski, J., concurring in the judgment). Once legislators and lobbyists know that the general legislative record will be used in construing statutes, they have great incentives to make comments or statements in the record solely to influence the judicial process. Note, *Why Learned Hand Would Never Consult Legislative History Today*, 105 Harv. L. Rev. 1005 (1992). See, also, Kenneth W. Starr, *Observations About the Use of Legislative History*, 1987 Duke L.J. 371, 377 ("It is well known that technocrats, lobbyists and attorneys have created a virtual cottage industry in fashioning legislative history so that [a legislature] will appear to embrace their particular view in a given statute"). Thus, the harm that results from reliance on the general legislative record is not undone by the fact that the same result can be reached without such reliance.

Even more troubling is that reference by the judiciary to the general legislative record provides a corrupting influence not only on the legislative process but on the judicial process as well, for the general legislative record can be manipulated to support almost any proposition. It has been likened to entering a crowded cocktail party and looking over the heads of the guests for one's friends. *Conroy v. Aniskoff, supra.* See William

N. Eskridge, Jr., *The New Textualism*, 37 UCLA L. Rev. 621 (1990). One court put it this way:

> Often there is so much legislative history that a court can manipulate the meaning of a law by choosing which snippets to emphasize and by putting hypothetical questions—questions to be answered by inferences from speeches rather than by reference to the text, so that great discretion devolves on the (judicial) questioner. Sponsors of opinion polls know that a small change in the text of a question can lead to large differences in the answer. Legislative history offers wilful judges an opportunity to pose questions and devise answers, with predictable divergence in results.

*Matter of Sinclair*, 870 F.2d 1340, 1343 (7th Cir. 1989). Indeed, in condemning our use of a discussion between three legislators to ascertain the meaning of statutory language, it was written:

> The action of the majority in this case is . . . the most dangerous precedent in statutory construction ever rendered by this court. If the precedent is followed in the future, any isolated phrase uttered by one legislator can be used as a scalpel to excise a provision this court deems unwise, unjust, or simply undesirable, or to change what, in this court's opinion, ought to have been done some other way.

*Wang v. Board of Education*, 199 Neb. 564, 572, 260 N.W.2d 475, 480 (1977) (Clinton, J., dissenting; C. Thomas White, J., joins).

The regrettable fact is that through the years, we have become sloppy and moved from reliance upon what our Legislature as a body did in the course of enacting ambiguous statutory language, *State, ex rel. Winnett, v. Omaha & C. B. Street R. Co.*, 96 Neb. 725, 148 N.W. 946 (1914) (change in wording during course of enactment), to reliance upon what a selected legislator or fractional group of such said during that process, e.g., *Chrysler Motors Corp. v. Lee Janssen Motor Co.*, ante p. 322, 534 N.W.2d 309 (1995); *George Rose & Sons v. Nebraska Dept. of Revenue, ante* p. 92, 532 N.W.2d 18 (1995); *Slack Nsg. Home v. Department of Soc. Servs.*, 247 Neb. 452,

528 N.W.2d 285 (1995); *Iverson v. City of North Platte*, 243 Neb. 506, 500 N.W.2d 574 (1993); *Coleman v. Chadron State College*, 237 Neb. 491, 466 N.W.2d 526 (1991); *Rodriquez v. Prime Meat Processors*, 228 Neb. 55, 421 N.W.2d 32 (1988); *County of Lancaster v. Maser*, 224 Neb. 566, 400 N.W.2d 238 (1987).

The former and tighter practice was reliable, the current and looser practice is not; we should therefore abandon the current practice and confine ourselves to studying what the Legislature as a whole did and ignore what any one legislator or fractional group of them said. See *Landgraf v. USI Film Products*, ___ U.S. ___, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994) (in declaring statute not retroactive, Court relied not upon congressional statements, but upon removal of retroactivity language during course of enactment).

FAHRNBRUCH and LANPHIER, JJ., join in this concurrence.