546 N.W.2d 315 (1996)
249 Neb. 913
SOUTHERN NEBRASKA RURAL PUBLIC POWER DISTRICT, a public corporation and political subdivision, et al., Appellants,
v.
NEBRASKA ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE, INC., an electric cooperative corporation, and Nebraska Public Power District, a public corporation and political subdivision, Appellees.
No. S-94-275.
Supreme Court of Nebraska.
April 25, 1996.
*317 Kenneth H. Elson, Grand Island, for appellants.
Thomas M. Maul, of Grant, Rogers, Maul & Grant, Columbus, for appellee Nebraska Electric Generation and Transmission Cooperative, Inc.
Gene D. Watson, Lincoln, for appellee Nebraska Public Power District.
John H. Skavdahl, of Skavdahl & Wickersham, Harrison, for amicus curiae Tri-State Generation and Transmission Association, Inc.
WHITE, C.J., CAPORALE, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.
CONNOLLY, Justice.
The appellants, Southern Nebraska Rural Public Power District (Southern), Elkhorn Rural Public Power District (Elkhorn), and Niobrara Valley Electric Membership Corporation (Niobrara), brought this action for declaratory judgment pursuant to Neb.Rev. Stat. § 25-21,149 et seq. (Reissue 1995). The appellants seek to have their wholesale electric power contracts with the appellee Nebraska Electric Generation and Transmission Cooperative, Inc. (NEG & T), declared void as against the public policy of this state. At trial, the action was submitted on stipulated facts. The district court found in favor of the appellees and dismissed the appellants' third amended petition. Southern, Elkhorn, and Niobrara appeal.
Upon the authority granted to us by Neb. Rev.Stat. § 24-1106 (Reissue 1995) to regulate the caseloads of the appellate courts of this state, we remove the appeal to this court. We conclude that the wholesale electric power contracts between the appellants and NEG & T are not void as against the public policy of this state. We therefore affirm.

BACKGROUND

HISTORICAL BACKGROUND
The appellants Southern and Elkhorn are rural public power districts organized as public corporations and political subdivisions. The appellant Niobrara is a nonprofit corporation. Each of the appellants owns and operates electrical distribution facilities and is a retail supplier of electrical energy to consumers in its district. The appellee NEG & T is an electrical cooperative corporation. The appellee Nebraska Public Power District (NPPD) is a public corporation and political *318 subdivision that supplies wholesale electrical energy to various public power districts and nonprofit corporations throughout this state.
A brief history of the development of electrical energy transfers in this state will be helpful for an understanding of the current wholesale power supply contracts between the appellants and NEG & T. Rural electrics in Nebraska receive the hydropower they distribute to their customers from the federal government. This federal hydropower, known as WAPA power, is marketed by the Western Area Power Administration and is brought into Nebraska from other states. At the time of the creation of NEG & T in May 1956, each of the appellants was contracting with Loup River Public Power District and Platte Valley Public Power and Irrigation District, doing business as Nebraska Public Power System, for the intrastate purchase of all its wholesale electric power requirements.
Prior to the incorporation of NEG & T, power districts in Nebraska could not obtain federal hydropower because state law did not authorize public power districts to do business outside the state. Furthermore, the cost of transmitting this power through the individual action of state primary users was prohibitive.
In October 1958, NEG & T's cooperative structure enabled it to enter into a loan contract for low-cost, long-term financing with the federal government, as represented by the Rural Electrification Administration (REA), in order to construct an electric system. Mortgages were given to secure the loans in which NEG & T assigned to the REA all of NEG & T's right, title, and interest in the wholesale power contracts it had with its members. NEG & T, with funding from the REA, then contracted for the construction of a 230-kilovolt transmission line from Fort Randall, South Dakota, to Columbus, Nebraska, which line was energized on July 1, 1960. This 230-kilovolt line was the first of its size in Nebraska interconnecting with the Federal Transmission System. After the Fort Randall to Columbus line was constructed, NEG & T financed and contracted to build, with loans from the REA, transmission lines from Mission, South Dakota, to Valentine, Nebraska, and from Hinton, Iowa, to west of Dakota City, Nebraska.

ASSIGNMENT OF APPELLANTS' INTERESTS TO NEG & T
In 1965, the appellants assigned their wholesale power contracts with Loup River Public Power District and Platte Valley Public Power and Irrigation District to NEG & T in order to "unify their efforts and to secure low cost federal hydropower." The following year Southern and Elkhorn, and in 1971 Niobrara, entered into requirements contracts with NEG & T for the purchase of all their wholesale power. In January 1972, NEG & T entered into a power purchase contract with NPPD. Under the contract, NEG & T leased its transmission lines to NPPD, and all the wholesale power requirements contracts previously assigned to NEG & T were combined to provide for the purchase by NEG & T and the sale by NPPD of the quantities of electric power required by NEG & T for the appellants and NEG & T's other members.
The wholesale power contracts between the appellants and NEG & T have been supplemented at various times in response to the REA's insistence that NEG & T take steps to ensure that its loan from the REA will be repaid. More specifically, as a condition to the extension of credit by the REA, NEG & T was required to amend its wholesale power contract with the appellants and other members to extend the term of the agreement to a date no less than 35 years from October 1, 1970. As a result, NEG & T's wholesale power contracts with the appellants now extend through the year 2006.

CURRENT DISTRIBUTION AND BILLING SYSTEM
The current distribution system operates such that electric power produced by NPPD is transmitted by NPPD to the appellants for distribution by the appellants to their respective customers. NPPD then reads the appellants' meters monthly and submits the power bills for the appellants, as well as 20 other members of NEG & T, to NEG & T. NEG & T then bills the appellants for the power supplied by NPPD after adding dues and assessment charges for membership in NEG *319 & T. The appellants and other members of NEG & T then send their payment checks to NEG & T. After deducting the amount charged for membership dues and assessments from each payment received, NEG & T then forwards a check to NPPD for payment of the power used by the appellants and other NEG & T members.
During the last 10 years, the administration expense of NEG & T has been more than $3,000,000. During this 10-year period of time, Southern was assessed dues and assessments totaling $241,167, Elkhorn was assessed dues and assessments totaling $87,048, and Niobrara was assessed dues and assessments totaling $63,024. All of said dues and assessments were used by NEG & T in paying administration expenses.
There are other rural public power districts within Nebraska, such as Norris Public Power District and Cedar-Knox County Rural Public Power District, which contract directly with NPPD for the purchase of all their wholesale power requirements under the same wholesale power rate schedules which are applicable to wholesale purchases made by NEG & T. By contracting directly with NPPD, these power districts avoid the dues and assessments charged to the appellants by NEG & T.

ASSIGNMENT OF ERROR
The appellants allege the trial court erred in failing to declare their wholesale electrical power contracts with NEG & T void as against the public policy of the State of Nebraska.

STANDARD OF REVIEW
In an appeal from a declaratory judgment, an appellate court, regarding questions of law, has an obligation to reach its conclusion independent from the conclusion reached by the trial court. Baker's Supermarkets v. State, 248 Neb. 984, 540 N.W.2d 574 (1995); Jones v. State, 248 Neb. 158, 532 N.W.2d 636 (1995); Columbia Nat. Ins. v. Pacesetter Homes, 248 Neb. 1, 532 N.W.2d 1 (1995).

ANALYSIS
The appellants allege their wholesale electrical power contracts with NEG & T are void as against the public policy of this state. More specifically, the appellants argue that if it were not for their contracts with NEG & T, they could contract directly with NPPD, and thus avoid the dues and assessments charged to them by NEG & T. Thus, the appellants assert that the costs of retail electrical energy would be lowered because they would not have to transfer their costs for dues and assessments onto consumers who purchase electrical energy from them. The appellants do not contend that the statutory provisions under which NEG & T was created are unconstitutional, that NEG & T is unauthorized to enter into wholesale power supply contracts, or that NEG & T breached its contracts with the appellants.
Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good, the principles under which the freedom of contract or private dealings are restricted by law for the good of the community. New Light Co. v. Wells Fargo Alarm Servs., 247 Neb. 57, 525 N.W.2d 25 (1994).
"`It is not the province of courts to emasculate the liberty of contract by enabling parties to escape their contractual obligations on the pretext of public policy unless the preservation of the public welfare imperatively so demands. * * * "the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." ...'"
OB-GYN v. Blue Cross, 219 Neb. 199, 204, 361 N.W.2d 550, 554 (1985), quoting from E.K. Buck Retail Stores v. Harkert, 157 Neb. 867, 62 N.W.2d 288 (1954).
The appellants base their public policy argument on Neb.Rev.Stat. §§ 70-1001 and 70-1101 (Reissue 1990). Section 70-1001 states:
In order to provide the citizens of the state with adequate electric service at as low overall cost as possible, consistent with *320 sound business practices, it is the policy of this state to avoid and eliminate conflict and competition between public power districts, public power and irrigation districts, individual municipalities, registered groups of municipalities, electric membership associations, and cooperatives in furnishing electric energy to retail and wholesale customers, to avoid and eliminate the duplication of facilities and resources which result therefrom, and to facilitate the settlement of rate disputes between suppliers of electricity.
Section 70-1101 states:
It is hereby declared to be the policy of the state to provide for dependable electric service at the lowest practical cost to all of the citizens of the state, including the residents of cities and villages.
The maintenance of competing electric systems within such cities or villages results in duplication of facilities and personnel and the needless expenditure of public funds by both such competing systems; that such needless expenditure for duplicating service by publicly owned agencies is not in accord with sound public policy. Whenever such duplicating competition exists in any municipality between a public power district organized under the provisions of Chapter 70, article 6, and other public agencies, including municipalities, such competition should be eliminated in the public interest for economy of operation and lower rates to the consumer.
In settling upon the meaning of a statute, an appellate court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being the court's duty to discover, if possible, the Legislature's intent from the language of the statute itself. Becker v. Nebraska Acct. & Disclosure Comm., 249 Neb. 28, 541 N.W.2d 36 (1995); White v. State, 248 Neb. 977, 540 N.W.2d 354 (1995).

§ 70-1101
It is clear from the plain language of § 70-1101 that the Legislature intended it to be applicable in instances where "competing electric systems within ... cities or villages" are at issue. In the instant case, we are not dealing with a scenario where two or more electric systems are competing against each other for consumer business within a given municipality. As a result, we conclude that the appellants' assertion that their contracts with NEG & T are void as against public policy based on § 70-1101 is without merit.

§ 70-1001
It appears the appellants' argument based on § 70-1001 is that their contracts with NEG & T are void as against public policy because the contracts create a duplication of resources proscribed by that section. A preamble or policy statement in a legislative act is not generally self-implementing, but instead is generally used, if needed, for assisting in interpreting the legislative intent for the specific act of which the statement is a part. See, 82 C.J.S. Statutes § 349 (1953); Black's Law Dictionary 1175 (6th ed.1990). To ascertain the intent of the Legislature, a court may examine the legislative history of the act in question. Omaha Pub. Power Dist. v. Nebraska Dept. of Revenue, 248 Neb. 518, 537 N.W.2d 312 (1995); Georgetowne Ltd. Part. v. Geotechnical Servs., 230 Neb. 22, 430 N.W.2d 34 (1988). In the introducer's statement of purpose to L.B. 220 (1963 Neb. Laws, ch. 397, p. 1258), the bill later enacted as chapter 70, article 10, of the Nebraska Revised Statutes, Senator Arnold Ruhnke stated:
The intent of LB 220 is to provide for the legalizing of boundary agreements between public power districts and municipally owned electric systems. The legalizing of these agreements will stop the duplications of facilities and prohibit the pirating of customers. The bill establishes a Power Review Board. The Board will have the power to establish boundaries between power districts, co-ops, and municipally owned electric systems in the event the districts fail to voluntarily work out such agreements.
Committee on Public Works, 73d Leg. (Feb. 11, 1963).
*321 This legislative history does not indicate that § 70-1001 was intended to be an all-encompassing statement of public policy for contractual agreements within the electrical power industry. Instead, the legislative history clearly illustrates that this section's intended purpose was limited to legalizing service area boundary agreements between public power districts and municipally owned electric systems and to establishing a power review board. Applying § 70-1001 in an all-encompassing manner as encouraged by the appellants would bring into question whether all electrical power purchase contracts, except those that involve a direct purchase by the consumer from the original power source, are void as against public policy. This court has expressly stated:
"The power of courts to invalidate contracts for being in contravention of public policy is a very delicate and undefined power which should be exercised only in cases free from doubt. It is not the province of courts to destroy the right to contract by enabling parties to escape their contractual obligations on the ground of public policy unless the preservation of the public welfare imperatively so demands."
Blanco v. General Motors Acceptance Corp., 180 Neb. 365, 374, 143 N.W.2d 257, 262 (1966). Accord Custer Public Power Dist. v. Loup River Public Power Dist., 162 Neb. 300, 75 N.W.2d 619 (1956).
In the instant case, NEG & T has played a significant role in the appellants' development as public power districts in this state. NEG & T's cooperative structure enabled it to enter into low-cost, long-term financing contracts with the federal government. These federal contracts in turn enabled NEG & T to construct a first-of-its-kind transmission line that brought low-cost federal hydropower into Nebraska for consumption by the appellants. The appellants assigned and entered into wholesale power contracts with NEG & T in order to unify their efforts and to secure this low-cost federal hydropower that was formerly unattainable.
Thus, given the plain language and legislative history of the statutes relied upon by the appellants, and the significant role NEG & T has played in the appellants' development, we hold that the preservation of the public welfare does not imperatively demand that the contracts at issue be declared void as against the public policy of this state. "`If every contract could be declared void because of a showing by an individual, a group of individuals, or even a significant portion of individuals that they could save money by breaking it, chaos would result....'" See Upper Mo. G & T Elec. Co-op v. McCone Elec. Co-op, 160 Mont. 498, 504, 503 P.2d 1001, 1004 (1972). As a result, we conclude that the trial court did not err in dismissing the appellants' third amended petition.

CONCLUSION
We conclude that the wholesale power contracts between the appellants and NEG & T are not void as against the public policy of this state.
AFFIRMED.
FAHRNBRUCH, J., not participating.
CAPORALE, Justice, concurring.
Although I agree with the judgment reached by the majority, I write separately because its reference to the statement of the introducer of L.B. 220, 1963 Neb. Laws, ch. 397, § 1, p. 1258, and other unspecified so-called legislative history of Neb.Rev.Stat. § 70-1001 (Reissue 1990) is both unnecessary and, for the reasons developed in my concurrence in Omaha Pub. Power Dist. v. Nebraska Dept. of Revenue, 248 Neb. 518, 537 N.W.2d 312 (1995), improper.
In describing the policy considerations underlying its determination to establish the Nebraska Power Review Board and giving it the powers and duties set forth in the rest of the act, the Legislature enacted § 70-1001, which reads:
In order to provide the citizens of the state with adequate electric service at as low overall cost as possible, consistent with sound business practices, it is the policy of this state to avoid and eliminate conflict and competition between public power districts, public power and irrigation districts, individual municipalities, registered groups of municipalities, electric membership associations, *322 and cooperatives in furnishing electric energy to retail and wholesale customers, to avoid and eliminate the duplication of facilities and resources which result therefrom, and to facilitate the settlement of rate disputes between suppliers of electricity.
I accept that if legislative intent is in question, an enacted policy statement such as the foregoing introductory language may be considered in resolving that issue. See, Shinrone Farms, Inc. v. Gosch, 319 N.W.2d 298 (Iowa 1982); Bricelyn School Dist. v. Board of Co. Commrs., 238 Minn. 53, 55 N.W.2d 597 (1952). However, such language must give way to the specific terms of the statutes composing the act. See Application of Atkinson, 291 N.W.2d 396 (Minn.1980). See, also, State ex rel. Spire v. Public Emp. Ret. Bd., 226 Neb. 176, 410 N.W.2d 463 (1987) (legislative declaration of constitutionality did not overcome true unconstitutional nature of statute). Moreover, a preamble cannot enlarge the scope and operation of a statute. Smith v. Brookfield, 272 Wis. 1, 74 N.W.2d 770 (1956).
But no question of legislative intent is involved. This case presents no issue concerning the elimination of conflict and competition, or the duplication of facilities and resources which result therefrom, or any rate dispute. Thus, there is no issue which is cognizable by the power review board, and for that reason, the case does not fall within the purview of the preamble.
Stated another way, the contracts at issue no more come within the language of § 70-1001 than they come within the language of Neb.Rev.Stat. § 70-1101 (Reissue 1990), a part of the act dealing with the retail distribution of electric service.
LANPHIER, J., joins in this concurrence.