REQUESTED BY: Rod Johnson, Chairman Nebraska Public Service Commission
On behalf of the Nebraska Public Service Commission ["Commission"], you have requested our opinion on two questions pertaining to an arrangement by which the Nebraska Public Power District ["NPPD"] has agreed to provide access to its fiber optic telecommunications system to Northeast Community College ["Northeast"] to allow Northeast to conduct video conferencing with high schools in Sioux City and Wayne, Nebraska. Your first question is whether NPPD is authorized by statute to engage in this activity. Your second question is whether NPPD may engage in this activity without obtaining a certificate of public convenience and necessity from the Commission.
I. Statutory Authority of NPPD.
NPPD is a utility "created and operate[d] by virtue of chapter 70, article 6, of the Nebraska Revised Statutes, . . . ."Omaha Public Power Dist. v. Nebraska Dept. of Revenue,248 Neb. 518, 520, 537 N.W.2d 312, 314 (1995). "NPPD operates an electric utility system and generates, transmits, distributes, and sells electricity within its chartered territory, which comprises 86 of Nebraska's 93 counties and portions of 5 other counties." Id. Pursuant to Neb. Rev. Stat. §70-602 (1990), NPPD is "a public corporation and political subdivision" of the state.
Public power districts created pursuant to Chapter 70, article 6, are required to submit a petition seeking approval of the Nebraska Power Review Board. Neb. Rev. Stat. § 70-603
(1990). Neb. Rev. Stat. § 75-604 (1990), which sets forth the required contents of the petition, provides, in subsection (1): "A district may be organized to engage only in the electric light and power business and the production and distribution of ethanol, only in the business of owning and operating irrigation works, or in all of such businesses."
Certain restrictions on the powers of public power districts are contained in Neb. Rev. Stat. § 70-625 (Supp. 1995). Specifically, § 70-625 provides, in pertinent part:
 In addition to the powers authorized by Chapter 70 and specified in its petition for creation as amended, a public power district may sell, lease, and service satellite television descrambling or decoding devices, satellite television programming, and equipment and services associated with such devices and programming, except that nothing in this section shall authorize public power districts (1) to operate as contract or common carriers engaged in furnishing communication services for hire in Nebraska intrastate commerce, . . . . (emphasis added).[1]
The above-referenced language in § 70-625 was part of an amendment enacted in 1987. 1987 Neb. Laws, LB 345, § 1. The primary impetus for the 1987 amendment was to permit public power districts to provide satellite television descrambling devices, programming, and related equipment and services in areas where cable television service was not available. CommitteeRecords on L.B. 345, 90th Leg., 1st Sess., 1 (Explanation of Committee Amendments); Floor Debate on L.B. 345, 90th Leg., 1st Sess., 2585 (Statement of Sen. Schmit); 2586 (Statement of Sen. Rogers). Senator Lamb, the bill's introducer, indicated that the language prohibiting public power districts from "furnishing communication services for hire" was intended to address concerns of "the telephone industry" that the bill's original reference to "telecommunications" was broad enough to be construed as "allowing public power districts to get into the telephone business. . . ." Committee Records on L.B.345, at 25 (Statement of Sen. Lamb). Senator Lamb stated that the amendment "would make it perfectly clear that that would not be allowed." Id.
The Legislature, in enacting § 70-625, stated its intent to prohibit public power districts from "furnishing communication services for hire", either as common or contract carriers. The history behind the amendment incorporating this language, while limited, indicates the Legislature's intent in adopting this language was to clarify that public power districts were not permitted to compete with or provide "communication services" provided by "telephone" companies.
As you state in your request letter, "[i]t is unclear whether the contract between Northeast Community College and NPPD is for `furnishing communication services for hire.'" Whether NPPD's involvement in this activity contravenes the limitation in § 70-625 presents primarily a factual question requiring consideration of various factors, such as the terms of the agreement between NPPD and Northeast, the nature of the parties' duties and responsibilities under that agreement, and the actual operation of the system. You indicate that NPPD asserts that Northeast obtains nothing more than "access" to NPPD's fiber-optic network.[2] You also note that "some of the telecommunications equipment is provided by Northeast."
Based on these facts, we are unable to express an opinion as to whether NPPD's arrangement with Northeast violates §70-625. We understand that the type of "video conferencing" service made available to Northeast by this arrangement could also be provided by US West Communications, Inc., a "certified local exchange telecommunications carrier in Nebraska." We agree with your conclusion, however, that the authority of NPPD to engage in this activity is "unclear". As such, we feel it is inappropriate for us to opine whether this arrangement is improper under Nebraska law.
Finally, while not referenced in your request letter, we note the potential application of recently enacted federal legislation which will undoubtedly drastically alter the telecommunications industry. The Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (1996) (codified inpertinent part at 15 U.S.C. § 79z-5c and 47 U.S.C. §§ 151
to 614) [the "Act"]. One author summarizing the impact of the Act has stated:
 The passage of the bill officially launched a new era of telecommunications in the United States. The Telecommunications Act of 1996 proposes to increase competition and advance technology within the communications industry, and to lower prices and provide more choices for consumers. This Act, encompassing the first major change in the telecommunications industry since the Communications Act of 1934, addresses the new world of information of technology and industry advancements.
Cook, Catherine, Legislative Summary: The TelecommunicationsAct of 1996, 6 DePaul LCA J. Art Ent. L. 237 (Spring 1996).
Of possible import to the issue presented is 47 U.S.C. § 253
(a), which provides: "No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." This obviously broad prohibition is, however, modified by other portions of § 253. First, subsection (b) of § 253 provides: "Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section [pertaining to universal service], requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." Second, subsection (c) of § 253 provides: "Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government. Finally, subsection (d) of § 253 provides:
 "If, after notice and an opportunity for public comment, the [Federal Communications] Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.
The broad prohibition in § 253(a) against state statutes or regulations that "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service" raises an obvious question as to whether the prohibition against public power districts providing "communication services for hire" in § 70-625 has been preempted. See Hillsborough County v. Automated MedicalLaboratories, Inc., 471 U.S. 707, 712 (1985) (quotingGibbons v. Ogden 9 Wheat. 1, 211 (1824)). (The Supremacy Clause of the United States Constitution renders void any state laws that "interfere with or are contrary to" federal law.). We decline to address this issue for two reasons.
First, the Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."47 U.S.C. § 153(46). NPPD is apparently not engaged in providing "telecommunications service" to the public, but, rather, has entered into an arrangement which allows a single entity to access its fiber-optic network. Thus, based on the facts presented, it does not appear that NPPD's activity falls within the definition of "telecommunications service" under the Act.
Second, the Act contemplates that a determination that a state or local statute, regulation, or legal requirement is preempted under § 253(a) or (b) is to be made by the Federal Communications Commission, "after notice and opportunity for public comment." 47 U.S.C. § 253(d). This subsection specifically provides that, if "the [Federal Communications] Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency." In light of the remedial scheme contemplated by the federal Act, under which the FCC is charged with determining if a state or local statute, regulation, or requirement is preempted by the Act, it is inappropriate for us to speculate concerning any potential preemption of § 70-625 by virtue of the prohibition in47 U.S.C. § 253(a).
Finally, we note that, in spite of the broad prohibitory language in subsection (a) of § 253, Congress did not intend to wholly divest the states of regulatory authority over telecommunications. In this regard, subsection (b) of § 253 provides:
 Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.
The provision of telecommunications services to the public by public power districts raises several public policy issues. Nebraska's public power districts, as political subdivisions, are governmental entities. The extent to or manner in which public power districts should be authorized to compete in the provision of services, such as telecommunications services, provided by private entities, involves important public policy considerations. Thus, Nebraska's prohibition against public power districts "furnishing communication services for hire" may fall within the retained state regulatory authority articulated in § 253(b), which allows states to impose requirements, "on a competitively neutral basis", which will "protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." For the reasons noted above, however, it is neither necessary nor appropriate for us to address these matters.
II. Necessity of NPPD Obtaining Certificate of Public Convenience and Necessity.
Your second question is whether NPPD must obtain a certificate of public convenience and necessity in order for NPPD to agree to provide Northeast access to its fiber-optic network to allow Northeast to engage in video conferencing with high schools in Sioux City and Wayne, Nebraska.
Neb. Rev. Stat. § 75-604(1) (Cum. Supp. 1995) provides, in part:
 Except as provided in section 86-805, no person, firm, partnership, limited liability company, corporation, cooperative, or association shall offer any telecommunications service or shall construct new telecommunications facilities in or extend existing telecommunications facilities into the territory of another telecommunications company for the purpose of providing any telecommunications service without first making an application for and receiving from the commission a certificate of public convenience and necessity, after due notice and hearing under the rules and regulations of the commission.
Under the arrangement between NPPD and Northeast, NPPD has agreed to provide Northeast access to NPPD's fiber-optic telecommunications system to allow Northeast to conduct video conferencing with high schools in Sioux City and Wayne, Nebraska. The fiber-optic network is apparently used by NPPD to provide "private line" service to NPPD, based on your reference to the network as a "private system." You also indicate that "some of the telecommunications equipment" is provided by Northeast.
Again, based on these facts, we cannot conclude that NPPD is offering "telecommunications services" within the meaning of § 75-604(1). The term "telecommunications services" is not defined in § 75-604, nor is it defined in any other Nebraska statute. We are also unaware of any Commission rule defining the term. It is unclear to us whether NPPD's mere agreement to permit access to Northeast to use NPPD's fiber-optic network in this manner constitutes the offering of "telecommunications services" within the meaning of § 75-604(1). Under these circumstances, we believe that it would be more appropriate for the Commission to utilize its authority and technical expertise to determine whether NPPD's activity falls within the scope of offering "telecommunications services", requiring the issuance of a certificate of public convenience and necessity. See In reApplication of Jantzen, 245 Neb. 81, 100, 511 N.W.2d 504,517 (1994) (Noting determinations of the Commission "are a matter peculiarly within its expertise" which are entitled to judicial deference).
Very truly yours,
 DON STENBERG Attorney General
 L. Jay Bartel Assistant Attorney General
APPROVED BY:
______________________________ DON STENBERG, Attorney General
[1] In addition, Neb. Rev. Stat. § 70-1021 (1990) limits the authority of public power districts to construct microwave communication facilities. Generally, the statute requires a district to obtain approval of the Nebraska Power Review Board prior to the construction and operation of its own microwave communication facilities.
[2] While not clear from your request letter, we assume that the fiber-optic system of NPPD is used by NPPD to provide "private line" service to NPPD, by virtue to your reference to NPPD's assertion that its fiber-optic network is a "private system".