REQUESTED BY: Lowell Johnson, Vice Chairman Nebraska Public Service Commission
On behalf of the Nebraska Public Service Commission ["Commission"], you have requested our opinion concerning the authority of the Nebraska Public Power District ["NPPD"] to provide certain telecommunications services on a for-hire basis as a contract carrier. Previously, in Op. Att'y Gen. No. 96076 (November 25, 1996), the Commission requested our opinion concerning the authority of NPPD to enter into an agreement to provide access to its fiber optic telecommunications system to Northeast Community College to allow Northeast to conduct video conferencing with high schools in Sioux City and Wayne, Nebraska. At that time, we concluded that, while Neb. Rev. Stat. §70-625 (Supp. 1995) prohibited public power districts from "operat[ing] as contract or common carriers engaged in furnishing communication services for hire in Nebraska intrastate commerce", we had insufficient factual information to enable us to conclude if NPPD was, in fact, engaging in providing communication services for hire under this arrangement. We further concluded that we did not have sufficient factual information to determine whether NPPD was offering "telecommunications service" necessitating the issuance of a certificate of convenience and necessity under Neb. Rev. Stat. § 75-604(1) (Cum. Supp. 1995).[1]
[1] As will be discussed more fully, infra, §§ 70-625 and75-604(1) were recently amended by 1997 Neb. Laws, LB 660, §§ 1 and 3.
After receiving our opinion, the Commission initiated, on its own motion, Application No. C-141/PI-18 to investigate whether NPPD was offering intrastate telecommunications services subject to Commission jurisdiction. Following a public hearing, the Commission, on May 28, 1997. entered an Interim Order determining that NPPD is providing telecommunications services on a for-hire basis as a contract carrier. In that Order, the Commission determined as follows:
 1. The services which NPPD offers by interconnection to its dark fiber for distance learning between Norfolk, Nebraska, and South Sioux City, Nebraska, are telecommunications services;
 2. The services which NPPD offers the City of Norfolk for intranet and internet access are also telecommunications services;
 3. The telecommunications services offered to Northeast Community College and the City of Norfolk are both offered by NPPD on a for-hire basis as a contract carrier;
 4. Service offerings such as those offered by NPPD fall within the Commission's jurisdiction under Neb. Rev. Stat. § 75-109 (1996); and
 5. The services offered by NPPD are being offered in the absence of any certificate of public convenience and necessity.[2]
In light of these findings, the Commission requests our opinion as to whether NPPD has statutory authority to provide these telecommunications services, and whether NPPD, if granted a certificate of convenience and necessity, can continue to provide these services under existing state law.
I. Statutory Authority of NPPD to Provide Telecommunications Services.
NPPD is a utility "created and operate[d] by virtue of chapter 70, article 6, of the Nebraska Revised Statutes, . . . ."Omaha Public Power Dist. v. Nebraska Dept. of Revenue,248 Neb. 518, 520, 537 N.W.2d 312, 314 (1995). "NPPD operates an electric utility system and generates, transmits, distributes, and sells electricity within its chartered territory, which comprises 86 of Nebraska's 93 counties and portions of 5 other counties." Id.
Pursuant to Neb. Rev. Stat. § 70-602 (1996), NPPD is "a public corporation and political subdivision" of the state.
Public power districts created pursuant to Chapter 70, article 6, are required to submit a petition seeking approval of the Nebraska Power Review Board. Neb. Rev. Stat. § 70-603(1) (1996). Neb. Rev. Stat. § 75-604 (1996), which sets forth the required contents of the petition, provides, in subsection (1): "A district may be organized to engage only in the electric light and power business and the production and distribution of ethanol, only in the business of owning and operating irrigation works, or in all of such businesses."
Prior to its recent amendment by 1997 Neb. Laws, LB 660, § 1, certain restrictions on the powers of public power districts were contained in Neb. Rev. Stat. § 70-625 (1996). Specifically, § 70-625 provided, in pertinent part:
 In addition to the powers authorized by Chapter 70 and specified in its petition for creation as amended, a public power district may sell, lease, and service satellite television descrambling or decoding devices, satellite television programming, and equipment and services associated with such devices and programming, except that nothing in this section shall authorize public power districts (1) to operate as contract or common carriers engaged in furnishing communication services for hire in Nebraska intrastate commerce, . . . . (emphasis added).
The portion of LB 660 providing that public power districts were not authorized "to operate as contract or common carriers engaged in furnishing communication services for hire in Nebraska intrastate commerce" was deleted from § 70-625 by 1997 Neb. Laws, LB 660, § 1. The legislative history of LB 660 reveals the Legislature deleted this explicit language prohibiting public power districts from providing communication services for hire to comply with § 101 of The Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (1996) (to be codified at47 U.S.C. § 253) [the "Act"], which, in subsection (a), provides: "No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." The Legislature determined the prohibition against public power districts providing communication services for hire in §70-625 was contrary to the language of § 253(a) of the Act because it expressly barred public power districts from entering into the field of providing telecommunications services. FloorDebate on LB 660, 95th Leg., 1st Sess., 4250-51 (April 15, 1997) (Statement of Sen. Kristensen).
While the specific language in § 70-625 prohibiting public power districts from providing communication services for hire was deleted by LB 660, this does not necessarily mean that NPPD possesses statutory authority to provide intrastate telecommunications services for hire on a contract basis. As several members of the Legislature noted during debate on the bill, the Legislature, by striking this express prohibition to comply with § 253(a) of the federal Act, was not acting to authorize public power districts to engage in furnishing telecommunications service for hire. Floor Debate on LB 660,
95th Leg., 1st Sess., 4254-55 (April 15, 1997) (Statement of Sen. Elmer); 4339 (April 15, 1997) (Statement of Sen. Tyson); 4353 (April 15, 1997) (Statements of Sens. Bromm and Kristensen). The question which remains, then, is whether public power districts such as NPPD are statutorily authorized to engage in providing telecommunications services for hire, even without the express prohibition previously contained in § 70-625.
Public power districts are, as previously noted, "public corporation[s]" and "political subdivision[s]" of the State. Neb. Rev. Stat. § 70-602 (1996). As "public corporations", public power districts "are subject to the plenary control of the Legislature", and, "[i]n the exercise of such power the Legislature may authorize, limit, control, or even destroy such public corporations, . . . ." Wittler v. Baumgartner,180 Neb. 446, 451, 144 N.W.2d 62, 67 (1966). While public power districts are authorized "to operate in a successful and profitable manner", Blankenship v. Omaha Public Power Dist., 195 Neb. 170,173, 237 N.W.2d 86, 88 (1976), the "public policy" underlying their creation was "the concept of electrical energy being furnished to the ultimate consumer at the lowest cost consistent with sound business judgment." Custer Public Power Dist. v.Loup River Public Power Dist., 162 Neb. 300, 313, 75 N.W.2d 619,627 (1956).
Public power districts may be organized, or amend their charters, by filing a petition seeking approval of the Nebraska Power Review Board. Neb. Rev. Stat. § 70-603(1) (1996). Neb. Rev. Stat. § 70-604 (1996), which governs the contents of the petition, provides, in part: "A district may be organized to engage only in the electric light and power business and the production and distribution of ethanol, only in the business of owning and operating irrigation works, or in all of such businesses; . . . ." (emphasis added). The Nebraska Supreme Court has stated that public power districts are "subject to the limitations, if any, of their petition which becomes their charter." Schroll v. City of Beatrice, 169 Neb. 162, 166,98 N.W.2d 790, 793 (1959). In Schroll, the Court also rejected the notion that a district may, by implication, exercise powers not expressly conferred by the statutes authorizing its creation and the petition creating its charter. In that regard, the Court quoted with approval the following passage from its earlier decision in State ex rel. Johnson v. Consumers Public PowerDist., 143 Neb. 753, 769-70, 10 N.W.2d 784, 795 (1943):
 It seems clear that an express proviso that a corporation shall not do certain acts is no stronger than the failure to give authority, express or implied, to do them, for powers not granted either expressly or impliedly, are impliedly prohibited.
169 Neb. at 170-71, 98 N.W.2d at 795.
Based on the foregoing, we conclude that NPPD, even with the enactment of LB 660, § 1, removing the language in §70-625 expressly prohibiting public power districts from engaging in providing communication services for hire, still lacks authority to engage in the business of providing telecommunications services for hire. NPPD is "subject to the limitations" in the petition, and any amendments, which operate as its charter to do business. Under § 70-604(1), a public power district may be organized to engage only in specified business activities. These activities include: (1) the electric light and power business; (2) the production and distribution of ethanol; (3) the ownership and operation of irrigation works; or (4) all of such businesses. Based on these statutory limitations, neither NPPD (nor any other public power district) is authorized by its petition (which operates as its charter to do business) to provide telecommunications services for hire. While § 70-625
continues to provide that a public power district "shall have all the usual powers of a corporation for public purposes", it provides that a district holds such powers "[s]ubject to the limitations of the petition for its creation and all amendments thereto, . . . ." As public power districts are limited in the type of businesses in which they may engage, and are not specifically authorized to engage in the business of providing telecommunications services for hire, we conclude that public power districts are not authorized to provide telecommunications services for hire under existing Nebraska statutes.
II. Potential Preemptive Effect of § 101 of the Telecommunications Act of 1996.
Having concluded that current Nebraska statutes do not authorize public power districts organized under chapter 70, article 6, including NPPD, to engage in providing telecommunications services for hire, it becomes necessary to consider whether this prohibition, arising from the Legislature's determination to limit the authority of public power districts by allowing them to engage in only specified business activities, contravenes the broad prohibition under the Telecommunications Act of 1996 against state statutes "prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." Telecommunications Act of 1996, § 101, (to be codified at 47 U.S.C. § 253(a)).
The Supremacy Clause of the United States Constitution renders void any state laws that "interfere with or are contrary to" federal law. Hillsborough County v. Automated MedicalLaboratories, Inc., 471 U.S. 707, 712 (1985) (quoting Gibbonsv. Ogden, 9 Wheat. 1, 211 (1824)); U.S. Const. art. VI, cl. 2. The crucial inquiry in preemption cases is whether Congress has manifested an intent to preclude the challenged state statute or regulation. Malone v. White Motor Corp., 435 U.S. 497 (1978). A congressional intent to preempt may be explicitly expressed by federal statute, or may be implicit in its structure and purpose.Jones v. Rath Packing Co., 430 U.S. 519 (1977); see also Rayv. Atlantic Richfield Co., 435 U.S. 151 (1978); Rice v. SantaFe Elevator Corp., 331 U.S. 218 (1947).
Section 253 (a) provides: "No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."[3] This broad language is indicative of an express Congressional intent to preempt any state or local statutes, regulations, or legal requirements that prohibit, or have the effect of prohibiting, any entity from providing telecommunications services. (emphasis added).[4] At least one state district court has construed § 253(a) to expressly preempt state statutes prohibiting cities from providing local telephone exchange service. Iowa Telephone Ass'n v. City ofHawarden, No. 18320, (Iowa Dist. Ct. for Sioux County) Ruling Re: Summary Judgment Motions Made by Both Plaintiff and Defendant (December 11, 1996). The Court found that, "assum[ing] without deciding that the Iowa noncompetition and/or city utility laws act as the Plaintiff charges and prohibits entry by cities into the local telephone arena, [ ] there is a complete barrier to entry of the type envisioned by the 104th Congress and is, therefore, preempted by the Telecommunications Act of 1996."Id. at 7.
While the plain language of § 253(a) precluding state laws or regulations that prohibit "any entity" from providing telecommunications services is broad enough to preempt Nebraska's statutory restrictions on public power districts, application of this portion of the Act to require the State to allow its public power districts to engage in an activity not permitted by state law raises a serious question as to whether the statute, if construed in this manner, impermissibly infringes on state sovereignty in violation of the Tenth Amendment and principles of federalism. As noted previously, public power districts are public corporations and political subdivisions of the State, and are wholly creatures of statute. As such, "the Legislature may authorize, limit, control, or even destroy such public corporations, . . . ." Wittler v. Baumgartner, 180 Neb. 446,451, 144 N.W.2d 62, 27 (1966). The question, then, is whether § 253(a), if construed to mandate that the State act to permit its own political subdivisions (specifically, public power districts) to provide telecommunications services, an activity which these public corporations have not been authorized to engage in by the Legislature, is an impermissible encroachment by Congress on the sovereign rights of the State secured by the United States Constitution.
The United States Constitution "establishes a system of dual sovereignty between the States and the Federal Government."Gregory v. Ashcroft, 501 U.S. 452, 457 (1991).
 The Constitution created a Federal Government of limited powers. `The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.' U.S. Const., Amdt. 10. The States thus retain substantial sovereign authority under our constitutional system.
Id.
"While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." New York v. United States,505 U.S. 144, 162 (1992). "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." Printz v.United States, 65 U.S.L.W. 4731, 4740 (June 27, 1997). "[T]he States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."Gregory v. Ashcroft, 501 U.S. at 461.
The Court's Tenth Amendment jurisprudence has admittedly not always followed a consistent course. E.g. Maryland v. Wirtz,392 U.S. 183 (1968) (holding state schools and hospitals subject to the Fair Labor Standards Act [FLSA]); National League ofCities v. Usery, 426 U.S. 833 (1976) (holding state employers were not subject to the FLSA, overruling Wirtz); Garcia v. SanAntonio Metropolitan Transit Authority, 469 U.S. 528 (1985) (holding state employers were subject to the FLSA, overrulingNational League of Cities). In National League of Cities, the Court held that the Tenth Amendment protected the states from being regulated by Congress in certain spheres, which it referred to as areas of the states' "traditional governmental functions."426 U.S. at 852. In Garcia, the Court abandoned this approach, largely because of difficulties in categorizing what activities constituted "traditional [state] governmental functions".469 U.S. at 546. The Court indicated that limits on Congress' power in this regard were not judicially enforceable, and that what limits the Tenth Amendment may impose were "enforceable" only through the "political process." Id. at 556. The Court reiterated this view in a later case. South Carolina v. Baker,485 U.S. 505, 512 (1988) (stating that "Garcia left open the possibility that some extraordinary defects in the national political process might render congressional regulation of state activities invalid, . . . .").
More recently, however, the Court has found certain Congressional acts to violate the Tenth Amendment. New York v.United States, 505 U.S. 144 (1992) (holding "take title" provision of Low-Level Radioactive Waste Policy Act, requiring states to accept ownership of waste or regulate according to the instructions of Congress, was outside Congress' enumerated powers and was inconsistent with the Tenth Amendment.); Printz v.United States, 65 U.S.L.W. 4731 (June 27, 1997) (holding unconstitutional provision of Brady Handgun Violence Prevention Act which the "chief law enforcement officer" of all local jurisdictions to perform background checks on handgun purchasers and related tasks.). And, in Gregory v. Ashcroft, the Court construed the Age Discrimination and Employment exception from the definition of covered "employees" for "appointee[s] on the policymaking level" to apply to appointed state court judges in order to "avoid a potential constitutional problem."501 U.S. at 464. The Court stated the Missouri constitutional provision at issue, which established a mandatory retirement age for state judges, went "beyond an area traditionally regulated by the States", and involved "a decision of the most fundamental sort for a sovereign entity." Id. at 460. The Court noted that "the authority of the people of the States to determine the qualifications of their most important government officials" was "a power reserved to the States under the Tenth Amendment and guaranteed to them by that provision of the Constitution under which the United States `guarantee[s] to every State in the Union a Republican Form of Government.' U.S. Const., Art. IV, § 4." Gregory v. Ashcroft, 501 U.S. at 463.
Given that the ability of a state to establish the qualifications of its governmental officials is recognized as a vital attribute of its sovereignty, it could also be argued that the ability of a state to create and define the powers of its political subdivisions is also an important component of a state's sovereign powers. If § 253(a) of the Act is, as we conclude it must be, construed to require Nebraska to authorize public power districts, political subdivisions created by the State, to engage in providing telecommunications services, in spite of the State Legislature's determination not to allow public power districts to engage in such activity, then we believe that a serious question exists as to whether application of § 253(a) in this manner violates the State's sovereign rights under the Tenth Amendment.
In light of the question as to whether Congress could, by enacting § 253(a), compel the States to authorize their own political subdivisions to provide telecommunications services, where state law does not permit these entities to engage in such activity, without impermissibly encroaching on powers reserved to the States under the Tenth Amendment, we cannot conclude that § 253(a) validly preempts Nebraska's statutory limits on the authority of public power districts which have the effect of precluding these districts from engaging in providing telecommunications services. Only a court, or, perhaps, the Federal Communications Commission,[5] could declare that the Legislature's determination to limit the authority of public power districts has been validly preempted by Congress. In the absence of such a decision, we cannot advise that Nebraska's public power districts must be allowed to engage in providing telecommunications services, in light of the absence of any authority to do so under the statutes allowing for their creation and existence.
This does not mean that the Legislature, if it chooses to do so, cannot amend the statutes governing the authority of public power districts to allow these districts to engage in providing telecommunications services. Furthermore, subsection (b) of § 253 allows broad state regulatory authority, providing: "Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section [pertaining to universal service], requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."
Under the federal Act, the Legislature clearly has the power to regulate public power districts to ensure that, if public power districts are authorized by the Legislature to enter into the business of providing telecommunications services, these important goals are satisfied. For example, the Legislature could impose "competitively-neutral" requirements on public power districts to "protect consumers" and "ensure quality of service", such as: (1) Require public power districts opting to provide telecommunications services to structurally separate power-producing operations from telecommunications operations; (2) Require districts to separately allocate expenses between power-related and telecommunications services, and to allocate capital investment costs for all shared facilities and services; and (3) Subject a district's telecommunications operations to the same regulations governing privately-owned telecommunications carriers, including payment of property, sales and use tax, and income tax, payment of all fees, charges, and other assessments imposed on telecommunications service providers, and mandate compliance with all regulations governing telecommunications service providers. The question of whether the statutes pertaining to public power districts, or other political subdivisions, should be altered to address the provision of telecommunications services by such entities, is a matter for the Legislature to decide.
III. Issuance by the Commission to NPPD of a Certificate of Convenience and Necessity.
You also ask whether NPPD, if granted a certificate of convenience and necessity to act as a contract carrier of telecommunications services for hire by the Commission, may "continue to provide the services being offered under existing state law."
Neb. Rev. Stat. § 75-604(1), as recently amended by 1997 Neb. Laws, LB 660, § 3, provides:
 Except as provided in section 86-805, no person, firm, partnership, limited liability company, corporation, cooperative, or association shall offer any telecommunications service or shall construct any new telecommunications facilities in or extend existing telecommunications facilities into the territory of another telecommunications company for the purpose of providing any telecommunications service without first making an application for and receiving from the commission a certificate of convenience and necessity, after due notice and hearing under the rules and regulations of the commission.[6]
While a certificate of convenience and necessity would, based on the Commission's findings in its Interim Order, be required for NPPD to continue to operate as a contract carrier providing telecommunications service for hire, we believe that, based on the absence of authority under Nebraska statutes for public power districts to engage in such activity at the present time, the Commission is precluded from issuing a certificate to NPPD. While we recognize that a question exists as to whether the Nebraska statutes barring NPPD from entering into the business of providing telecommunications services may, if challenged, be found to be preempted by § 253(a) of the Act (either by the FCC, pursuant to § 253(d), or a court), until such time as the operation of these statutes is declared to violate the Act, and the Act is found not to impermissibly infringe on the state's sovereign rights, the Commission is without authority to ignore their effect by issuing NPPD a certificate of convenience and necessity.
Very truly yours,
 DON STENBERG Attorney General
 L. Jay Bartel Assistant Attorney General
APPROVED BY:
DON STENBERG
Attorney General
[2] For purposes of this opinion, we will accept the Opinion and Findings portion of the Commission's Interim Order concluding that NPPD is engaged in providing telecommunications services for hire on a contract carrier basis to Northeast Community College and the City of Norfolk.
[3] There may be some question as to whether NPPD's present contract carriage arrangements under two agreements constitutes the provision of "telecommunications service" within the meaning of § 253(a). "Telecommunications services" is defined to mean "the offering of telecommunications for a fee directly to the public, or to such class of users as to be effectively available to the public, regardless of the facilities used."47 U.S.C. § 153(46). The legislative history indicates this was intended to recognize a distinction between "common carrier" and "private" services. House Rep. No. 104-204, 104th Cong., 2d Sess. 126, reprinted in 4 U.S.C.C.A.N. 94 (1996) ("By defining `telecommunications service' as those services and facilities offered on a `common carrier' basis, the Committee recognizes the distinction between common carrier offerings that are provided indifferently to the public or to such classes of users as to be effectively available to a substantial portion of the public, and private services."); House Conf. Rep. No. 104-458, 104th Cong., 2d Sess. 113, reprinted in 4 U.S.C.C.A.N. 125 (1996) (Definition of "telecommunications service" "intended to include commercial mobile service ("CMS"), competitive access service, and alternative local telecommunications services to the extent they are offered to the public or to such classes of users as to be effectively available to the public."). While the Commission's findings indicate NPPD is presently providing contract carrier service under only two agreements, thus raising a question as to whether it is effectively offering service to the public under the definition in § 153(46), we will proceed to analyze the issue presented on the assumption that NPPD's activities constitute "telecommunications services" within the meaning of the federal Act.
[4] The legislative history of the federal Act also indicates the broad nature of the prohibition, stating this portion of the Act was "intended to remove all barriers to entry in the provision of telecommunications services." House Conf. Rep. No. 104-458, 104th Cong., 2d Sess. 127 (1996), reprinted in 4 U.S.C.C.A.N. 138 (1996). The House Conference Report also includes the following explanation of the scope of state regulatory power under § 253(b), including the ability of a state to regulate other utility providers entering into telecommunications businesses:
 New section 253(b) clarifies that nothing in this section shall affect the ability of a state to safeguard the rights of consumers. In addition to consumers of telecommunications services, the conferees intend that this includes the consumers of electric, gas, water or steam utilities, to the extent such utilities choose to provide telecommunications services. Existing state laws or regulations that reasonably condition telecommunications activities of a monopoly utility and are designed to protect captive utility ratepayers from the potential harms caused by such activities are not preempted under this section. However, explicit prohibitions on entry by a utility into telecommunications are preempted under this section.
Id. at 127, reprinted in 4 U.S.C.C.A.N. 139 (1996) (emphasis added). This also indicates a Congressional intent to include utility providers, including public power districts, within the scope of entities which cannot be prohibited from providing telecommunications services.
[5] Subsection (d) of § 253 establishes a mechanism for the Federal Communications Commission ["FCC"] to make a "preemption" determination. This subsection provides:
 If, after notice and an opportunity for public comment, the [Federal Communications] Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.
[6] Previously, while we noted that no statute or Commission rule defined "telecommunications service", we note that LB 660, § 6, amends Neb. Rev. Stat. § 86-802 to add a definition of "[t]elecommunications" as "the transmission, between or among points specified by the subscriber, of information of the subscriber's choosing, without a change in the form or content of the information sent or received." This definition is virtually identical to the definition of "telecommunications" in the federal Act. 47 U.S.C. § 153(43). "Telecommunications service" is defined in § 6 of LB 660 as "the offering of telecommunications for a fee." The Commission, in its Interim Order, specifically found that NPPD is operating as a contract carrier of intrastate telecommunications services for hire.